## Court of Appeals.

June, 1903.

## THE PEOPLE v. PATRICK CONKLIN.

(175 N. Y. 333.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of an indictment for murder examined and held sufficient to warrant a verdict convicting the defendant of the crime of murder in the first degree.

2. Special Jury Law Constitutional—Acts of Commissioner of Jurors de Facto Valid.

A challenge to the panel or the array is properly overruled where it is based upon the claim that the Special Jury Law (L. 1896, ch. 378) is unconstitutional, and that the panel was drawn by a person who was not a commissioner, since the law is constitutional, and the mere fact that another person was subsequently declared entitled to the office does not affect the validity of the official acts of the incumbent for the time being.

3. Jury—Challenge for Cause.

The knowledge or ignorance of a juror concerning questions of law is not a proper subject of inquiry upon the trial of a challenge for cause.

4. Evidence—Dying Declarations.

Declarations of the deceased to the effect that her husband shot her, made under circumstances warranting the conclusion that what she said was in view of impending death without any hope of recovery, are properly admissible in regard to the cause of death and the author of the crime.

5. Trial—Opening Address of District Attorney.

Where nothing is said in the opening address of the prosecuting officer which exceeds the proper limit of advocacy, no question of law is presented for review by the Court of Appeals.

6. Refusal of the Court to Hear Additional Requests to Charge.

A ruling by the court that questions by jurors must be through the foreman is reasonable and within its discretion, and a refusal of the court, late at night, to hear counsel when the jury who had retired came in for further instructions, where every aspect of the case had been already covered by the charge, is not reversible error.

7. Evidence—Immaterial Error in Exclusion of—Code Crim. Proc., Sec. 542.

The exclusion of testimony tending to prove that three years prior to the homicide a pistol had been in the hands of the deceased and that she then stated that she intended to commit suicide, while erroneous, under the circumstances not regarded as material.

8. Same.

The admission in evidence of records from the police courts of criminal proceedings instituted by the wife against the defendant several years before, in order to show the relations between the husband and wife, and hence a motive on his part for the commission of the crime, not objected to specifically on the ground that they were not evidence of the crime charged therein, but generally upon the ground that they were too remote, cannot be regarded as a substantial error where it could have worked no prejudice to the defendant.

APPEAL from a judgment of the Court of General Sessions of the county of New York, rendered October 27, 1902, upon a verdict convicting the defendant of the crime of murder in the first degree; also from an order denying motions for a new trial.

The facts, so far as material, are stated in the opinion.

Lewis Stuyvesant Chanler and Charles Cohn, for appellant.

William Travers Jerome, District Attorney (Howard S. Gans, of counsel), for respondent.

O'BRIEN, J.: The defendant was convicted of the murder of his wife in the tenement-house where they lived, No. 447 West Sixteenth street, between Ninth and Tenth avenues, in the city of New York. The rooms which the deceased and the defendant occupied consisted of a shop in the front, in which the wife conducted a candy store and ice cream saloon, a room back of that, a bed room behind it, and beyond that a kitchen extending to the rear of the house. In this rear room the deceased received four pistol shot wounds on the 9th day of June, 1902, which produced her death on the same day. The indictment charged and the jury found that these wounds were inflicted by the defendant with the deliberate and premeditated design to effect the death of his wife. The autopsy disclosed four wounds, one passing through the right hand entering at the base of the thumb at the back of the hand, another passing through the windpipe entering at the left of the neck; the third entering the breast on the left side and crossing the body and coming out above the right nipple; the fourth entering an inch to the left of the spine, just below the scapula, and taking a downward course into the left pleural cavity.

No witness, unless it be the defendant himself, saw the shooting or heard the report of the pistol. The claim of the de-

fendant was that his wife committed suicide and on the witness stand he denied in general terms that he killed her. When the police officer reached the house after the homicide the defendant handed him a pistol, saying, " That is what she did it with." The revolver was produced at the trial, and it was shown that when handed to the officer by the defendant at least four of the cartridges had been discharged. There was really no proof in the case that would authorize the jury to find that the deceased had taken her own life. On the other hand, the proof, although almost entirely circumstantial, tended to show that the defendant was the author of the crime.

The defendant and his wife had been married about six years prior to the homicide. Their whole married life was one of turmoil, strife and violence. The evidence tended to show that during that period the defendant had been arrested more than once for assaulting or abandoning his wife. He had not only assaulted her, but threatened on several occasions to take her life, and these threats continued down to the very day of the homicide. It would be tedious to describe these quarrels with much detail. It is sufficient to say that they reveal a most unhappy relation of husband and wife, and on the part of the husband frequent explosions of bitter passion accompanied by violence of a brutal character. His feelings towards the deceased were evidently those of hatred, which extended to all her family. This strained and unnatural relation of the parties, it is claimed by the prosecution, constituted the motive for the crime. It is a fair conclusion from all the evidence that the defendant and the deceased were alone in the house when the shooting occurred. In a very short time after this a woman who lived near by entered the room and finding the body of the deceased lying prostrate upon the floor attempted to raise her up and by questions to ascertain what was the matter and what had happened. The only answer that she was able to draw from the deceased

was, "Get the priest for I am dying." The defendant was present while this woman was attempting to raise up the body of the deceased, and she was sworn at the trial and testified to statements made then and there by the defendant to the effect that he had fired the shots that entered the body of the deceased. The pistol from which the shots were fired was found in the possession of the defendant, but he claimed that it was handed to him by one of the women who were in the room immediately after the shooting. The defendant did not go to his usual work that day, but slept late and then visited one or more of the saloons in the neighborhood. The father of the deceased lived in the same apartments with his daughter, and there was some proof tending to show that the defendant attempted to have him ejected the evening before the homicide, but at the request of the daughter he remained. He was a laborer and went to his work the morning when the shooting occurred and saw nothing of it. The younger brother and sister of the deceased were with her during most of the day that the shooting occurred, but they left before the shooting, and the testimony tended to show that one or both of them were sent away by the defendant.

The life of the deceased was insured by two policies in the Prudential Insurance Company, one dated October 22, 1900, and the other September 2, 1901, payable to her personal representatives. The policies represented comparatively small amounts, and, although the defendant attempted to collect them after the death of the wife, these facts do not seem to have been regarded of much importance at the trial. There was another fact established by the proof which is more important, and that is the fact that the deceased was right handed, always using the right hand to write, sew and knit, and generally in all her movements when necessary to use the hands. The wounds found upon her body after death were all inflicted on the left side, thus showing, as is claimed, that the wounds could not have been self-inflicted. Without further relating the numerous facts

and circumstances that are claimed to have some bearing, direct or remote, upon the issues in the case, it is quite sufficient to say that the case was for the jury upon the facts. The evidence was sufficient to justify the verdict, and this court cannot, without departing from its appropriate jurisdiction and functions, interfere with the facts as determined by the jury.

The record contains numerous exceptions taken by the learned counsel for the defendant in the course of the trial. Most of them are of no importance and need not be referred to. A few of them call for an answer or explanation and two or three present questions of a more serious character. In the selection of the jury the learned counsel for the defendant interposed a challenge to the panel or the array, which was overruled. The challenge was based upon the claim that the special jury law was unconstitutional and that the panel was drawn by a person who was not the commissioner. The first proposition is untenable, since the question has been decided the other way. (People v. Dunn, 157 N. Y. 528; People v. Hall, 169 N. Y. 184.) The commissioner was at least an officer *de facto* and the panel drawn by him was regular. (People v. Petrea, 92 N. Y. 128, 143; People v. Youngs, 151 N. Y. 210, 218.) The circumstance that another person was subsequently declared entitled to the office does not affect the validity of the official acts of the incumbent for the time being. (Matter of Allison v. Welde, 172 N. Y. 421.)

The defendant's counsel propounded certain questions to individual jurors upon a challenge for principal cause, which were objected to by the district attorney, and the objection being sustained by the court an exception was taken. The questions were substantially the same in every case. The juror was asked whether he knew that in law the accused in a criminal case was to be presumed innocent until proved guilty, and that the proof in a criminal case must be stronger in order to convict than in a civil case involving like issues. The objection to these ques-

tions was properly sustained.   The qualifications of a juror do not depend in any degree upon his knowledge, or want of knowledge, of the law of evidence as applicable to criminal trials. These were all matters of law which the juror was bound to take from the court.   A juror cannot be a law to himself, but is bound to follow the instructions of the court in that respect, and hence his knowledge or ignorance concerning questions of law is not a proper subject of inquiry upon the trial of the challenge for cause.

Perhaps the most important evidence in the case was the dying declarations of the deceased.   They were objected to when offered, but the objection was overruled and an exception taken.   Attention has already been called to that fact that while the deceased was lying on the floor she said nothing except that she was dying and to get a priest.   In a few minutes after the priest came, and, finding her unconscious, administered the last rites of the church, conditionally.   She was then removed in an ambulance to St. Vincent's Hospital, where one of the physicians, with the aid of stimulants, revived her for a few minutes.   It was then that the physician had the few words of conversation with the deceased that constitute the testimony objected to, and which is stated in the record, as follows:   " I asked her why she shot herself; she didn't answer; and I then told her that—I told her that to come to a conclusion as to the severity of her injuries, I would like to know the direction or course of the bullets; that might not be the exact words, similar to that; she didn't say anything for a time; neither did I; and then I said, ' Who shot you ? ' and she said, ' My husband;' I asked her how many times; she said she didn't know; I said, ' Well, where did he stand ? ' she said, 'At my side,' and I said, ' Which side, this side ? ' touching her on the left side, and she said, ' Yes,' and I said, ' Well, where did he stand the next time ? ' and she sort of collapsed and didn't answer; and that is all that was said; immediately after that, or a short time

after that, I left the room." This conversation, which the physician says was had in the space of three minutes, was the last that the deceased had with any one. She died in a few minutes after the collapse. Only about an hour and a half elapsed from the time that she requested that the priest be sent for until she died. We think that, considering the number and character of the wounds and her statement both at the house and at the hospital that she was dying, warrants the conclusion that what she said was in view of impending death without any hope of recovery. The physician stated that within two or three minutes before the collapse she said to him, " Turn me over, I am dying." The probability is that this was said after and not before her statement that her husband shot her; but however that may be, it is quite impossible to say that any hope of recovery intervened to affect her statements as dying declarations, after her request to send for the priest. We think, therefore, that the testimony of the physician was admissible as proof of the dying declarations of the deceased in regard to the cause of death and the author of the crime.

The district attorney, in opening the case to the jury, stated with considerable detail the facts bearing upon the conduct of the defendant towards his wife during the six years of their married life as he expected to prove them. The learned counsel for the defendant objected to many of these statements and called the attention of the court to some of them, and upon the refusal of the court to interfere took exceptions. Nothing was said in the opening address that exceeded the proper limits of advocacy. The prosecuting officer has the right to try his case in the same way and subject to the same rules as other counsel. It is only when he resorts to violent denunciation and to matters not embraced in the proofs or involved in the issue that the court may interfere. So long as the opening or closing address is based upon facts intended to be proved and pertinent to the issue or upon facts which the proof tends to establish, the man-

ner of presenting them must be left very largely to the good
sense and good taste of the advocate and the watchful vigilance
of the trial court.     The case must be quite exceptional where a
question of law, reviewable in this court, is presented, based
upon the address of the prosecuting officer.

The charge of the court covered all the legal principles ap-
plicable to this case, and, I think, is not open to any just
criticism.     The jury retired to deliberate upon their verdict
at about half-past 6 in the evening.     In about four hours
afterwards they requested that certain portions of the charge
should be read to them.     They were brought into court and the
charge called for was read.     In reply to a question from a juror,
the court gave some further instructions, the point of which
was that a reasonable doubt must be founded upon the evidence
in the case.     The defendant's counsel excepted and asked that
some further instructions be given, which he formulated.     The
court charged some of the requests and refused others, but no
legal error can be or is based upon what then took place.     About
an hour later the jury again came into court and requested that
what the court said to defendant's counsel's requests " as to lack
or absence of evidence " be read to them.     It was read, includ-
ing the exception of defendant's counsel and his supplemental
requests and what the court said in response to the same.     It
was then 11 o'clock, and the court, perceiving that another
juror was about to propound a question, remarked that any
further questions must be stated through the foreman.     The
court also perceiving that the defendant's counsel was about to
make another request, remarked that he would not hear him
further and an exception was taken.     The ruling that questions
by jurors must be through the foreman was reasonable and
within the discretion of the court, and the refusal to hear coun-
sel further at that stage of the case was not legal error.     The
jury called for the reading of certain parts of the record.     It
was read but no new instructions were given.     The defendant's

counsel had been fully heard upon numerous requests before the jury retired and subsequently when they came into court. He had no right to reopen the case to propound fresh requests after having covered every aspect of the case already. The jury, through the foreman, had stated to the court that they were likely to agree in a very short time and the court in the exercise of discretion might refuse to detain them longer at a late hour of the night after an exhaustive trial in which every possible view of the case had been presented by defendant's counsel in argument and by requests to charge.

There are two other exceptions in the case that illustrate the tendency, too prevalent, of prosecuting officers to inject into the record of a capital case all manner of close and doubtful questions, that while they add nothing to the strength of the People's case, serve to embarrass this court in any review of the judgment and greatly increase its labors. The defendant's counsel called a witness and propounded to her a series of questions all intended to prove that three years prior to the homicide the witness had seen a pistol in the hands of the deceased and that she then stated that she intended to commit suicide. The questions were all objected to by the district attorney, excluded by the court, and an exception taken to the ruling. We must assume that the witness, if permitted, would have answered the questions in the affirmative. We think that this testimony, though quite remote, was admissible on an issue of fact involving the question whether the deceased took her own life or her death was caused by the act of the defendant. If it be true that the deceased at any time carried or kept a pistol, or was familiar with the use of it, that circumstance had some bearing on the issue in the case, though very slight. But the theory of suicide had such a very slender support in the evidence that the error, if any, cannot be regarded as material. The only basis for that suggestion was the statements of the defendant himself after the shooting occurred, and, although a witness in his own

behalf at the trial, he testified to no fact in support of these statements.    The testimony all tended to show that he was in the rooms at the time, and yet, when on the stand, he claimed that he did not hear the firing and had no knowledge as to how it occurred.    The jury could have found, in view of all the facts, that these statements of the defendant were intended to divert attention and suspicion from himself.

The district attorney produced and put in evidence against the objection and exception of the defendant's counsel certain records from the police courts of criminal proceedings instituted by the wife against the defendant in the year 1898, and again in 1900.    These records contain the sworn complaints of the wife, charging the defendant with disorderly conduct, threats and assaults, and also abandonment and refusal to support or provide for her or her child.    Then follows the warrant for his arrest, the return of the officer, the bail bonds and other proceedings in detail.    In at least two of the cases the record shows that in the end the proceedings were withdrawn at the request of the wife.    These records were offered to show the relations between the husband and wife, and, hence, a motive on his part for the commission of the crime.    But the defendant's brutal conduct towards his wife, the absence of all respect or affection on his part for her and his disregard of every duty that he owed to her, were all abundantly established by the testimony of living witnesses, and, hence, the records from the police courts were unecessary.    They did not prove that defendant was actually guilty of the various offenses charged in the affidavits, since there was no judgment in the proceedings.    They did, however, prove one fact that was material, and that is that the defendant had been arrested and prosecuted upon charges made by the deceased.    Whether the defendant was innocent or guilty of the charges, the jury could have found that all these things still rankled in his bosom, especially as there was no change in the general relations of the parties, and no reformation in the

defendant's conduct. These proceedings, although at least two years prior to the homicide, would naturally beget in the mind of a person constituted as the defendant evidently is, a feeling of animosity and hatred that could not be gratified except by the most extreme acts of violence. The strength of the motive in such cases depends largely upon circumstances. In this case had the parties become reconciled and the conduct of the husband had undergone a total change upon the withdrawal of the proceedings by the wife, the proof would be very weak, if admissible at all. But the relation of husband and wife differs in this respect from all others, and when, as in this case, the causes that beget domestic quarrels still exist and are in full operation, remote occurrences frequently have a powerful influence upon the mind. But the records were not admissible to prove any fact stated or recited therein or prove that the defendant had committed any of the acts charged, and had this specific objection been made when the papers were offered it should have been sustained. The objection, however, was general, on the ground that the records related to matters too remote, and was properly overruled. (Murphy v. People, 63 N. Y. 592.) There was really no dispute about the fact that the relations of the parties during their entire married life and down to the day of the homicide were strained to such a tension that acts of violence were liable to occur and might be expected at any time, and even if the objection had been limited to the point suggested it would be difficult to say that the admission of the papers could work any prejudice to the accused. This court is required to decide cases of this character without regard to technical errors or defects or exceptions that raise no substantial question that could prejudice the rights of the defendant. (Code, sec. 542.) The exceptions discussed in the last two points fairly come within the scope of that section, and the error, if any, in the ruling of the court, could not prejudice the rights of the accused.

In determining the guilt or innocence of the defendant it was impossible for the jury to overlook the general features of the case or to mistake their significance as bearing upon the truth of the matters involved in the issue.    The defendant spent the day which ended in the tragedy in idleness and in visiting saloons.    He was in a condition of mind, as appears from some of his own statements (testified to by witnesses), to commit the act with which he is charged.    The shooting took place when the father, brother and sister of the wife were absent and no human eye could witness the tragedy.    The jury could have found that the husband and wife were alone in the room when the shots were fired.    The number, character and course of the wounds, one passing through the right hand, show that they could not have been self-inflicted.    The defendant's ostentatious parade of the pistol after the shooting as the weapon with which the deceased committed suicide and everything he did and said while his wife lay prostrate upon the floor pointed to him as the author of her death.    He has been defended by zealous counsel with great skill and ability.    No point was overlooked either at the trial or upon the argument in this court that could possibly inure to the benefit of his client.    There are a great many exceptions in the case that have not been referred to, but we have examined them all and find that the record does not present any error of law or fact that would warrant this court in interfering with the judgment, and so it must be affirmed.

PARKER, Ch. J., GRAY, HAIGHT, MARTIN, CULLEN and WERNER, JJ., concur.

Judgment of conviction affirmed.