STATE OF IOWA, Appellee, v. GENOUR BEESON, Appellant.

**Criminal law:** MURDER: EVIDENCE. On a prosecution for wife murder evidence that a child of defendant appeared at the home of a witness shortly before decedent's death and stated that defendant had sent him for a certain purpose was improperly received.

**Same:** HEARSAY. Evidence that at different times the decedent had stated to others that accused had committed acts of personal violence against her and abused and neglected her, which were not so immediately connected with the crime as to be a part of the *res gestae,* were inadmissible; and the evidence was not rendered admissible on redirect examination because the witness had been asked on cross-examination if decedent had not spoken kindly of the defendant and whether decedent made any complaint against him.

**Same:** DEFENSE OF SUICIDE: EVIDENCE. Where a defendant charged
3 with the murder of his wife claimed that decedent committed
suicide, the burden of establishing suicide was not upon him,
but he was entitled to offer evidence to the effect that decedent
had consulted physicians to ascertain the nature of her ailment
and to show that on different occasions decedent had discussed
the question of suicide with others, whether she threatened sui-
cide, what reasons she gave for such threats and the time and the
circumstances under which they were made, for the purpose of
establishing his defense or creating a reasonable doubt of his
guilt.

**Same:** REBUTTAL EVIDENCE. Where the state in such cases relies
4 upon want of family harmony and alleged brutal treatment of
decedent as tending to show evil motive and malice on his part,
the defendant may rebut the inference by showing apparently
affectionate, harmonious and kind relations with his wife.

*Appeal from Linn District Court.*—HON. MILO P. SMITH,
Judge.

WEDNESDAY, MAY, 15, 1912.

THE defendant was indicted for the murder of his
wife, and, being convicted of manslaughter, appeals.—
*Reversed.*

*Tom H. Milner* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,*
Assistant Attorney General, for the State.

WEAVER, J.—The defendant and family, consisting
of his wife and three young children aged from six months
to five years, lived in a farm house near Mt. Vernon in
Linn county.  He was himself employed as a laborer upon
a neighboring farm.  One Mendenhall and wife, parents
of Mrs. Beeson, resided a mile and a half distant.  Under
the terms of his employment defendant lodged at his own
home but took his meals at the house of his employer, one

Neal, some sixty rods distant. On September 29, 1910, Neal and his family went from home in the morning and remained away most of the day, leaving the defendant at work on the farm. For at least a portion of the day he was engaged in hauling gravel and repairing fences. Several weeks prior to this time he had borrowed a double-barreled shotgun from Neal and had been in the habit of taking it out into the field where he worked and was heard to fire it at times before and after his working hours; but it is not shown whether he had it in the field on the day of the alleged murder. Some time in the afternoon the oldest child appeared at the home of the Mendenhalls, his grandparents. He explained the errand on which he had come, and to his statement in this respect further reference is hereinafter made. About an hour later, the defendant, driving rapidly with team and wagon and bringing his two younger children, came to the Mendenhalls and in an excited manner exclaimed that his wife "had left him;" that she "was dead in the house." Mrs. Mendenhall at once charged him with murder of his wife, but he denied it, saying she had no reason to make such an accusation. The party, together with a neighbor or two, immediately drove to defendant's home, and, entering the house, found the wife lying dead on the floor. The shotgun was laid across an overturned chair to which it was fastened with muzzle pointing in the direction of the body. A string tied at one end of the trigger passed back over a chair rung and forward again to the body, where it was wrapped about the hand of the deceased. The charge from the gun had entered the head of the deceased just under and a little back of the left ear. The wound was "clean-cut" and about the size of a silver half-dollar. The situation rendered it clearly apparent that the woman had committed suicide, or that she had been slain by another person who arranged these details to create a false impression or inference of suicide and thereby conceal his

crime. There was more or less evidence as to the details of the situation revealed at the defendant's home and of alleged contradictions and inconsistencies of conduct on the defendant's part tending, to some extent at least, to discredit the theory of suicide and support the theory of a felonious killing; but of the weight and credibility of such testimony we express no opinion. Without going into further details at this point, it may be said that the fact that the death of the deceased was produced by this gunshot wound is shown beyond reasonable dispute, and that the vital questions upon the trial were whether that wound had been feloniously inflicted by another person, and, if so, whether the evidence establishes the defendant's guilty agency therein. This presents a sufficient statement of the record to indicate the materiality and bearing of the several assignments of error which are advanced by the defendant in support of his appeal.

I. Mrs. Mendenhall, mother of the deceased, having testified that her five year old grandson appeared at her home some time after noon on the day of his mother's death and remained there until defendant appeared an hour later, as we have already related, was asked by the prosecutor (referring to the child), "What did he say?" and over the objection of the defendant she was allowed to answer that the boy said he had come for his mother's pocketbook, which she had left there the day before, and that his father had sent him for it. She further testified, over appropriate objections, that deceased during her married life had said to witness (not in defendant's presence) that defendant had struck her on at least two occasions; had called her names; that she suspected him of "running with other women;" that on one or more occasions he had gone away leaving her without food; that she had been driven to seek charity; that he was intemperate, and when drinking would abuse her. Similar testimony was also given

1. CRIMINAL LAW: murder: evidence.

by other witnesses over the objection of the defendant. Another witness testified to visiting deceased at one time when hen husband had left her and found her in a state of destitution. The matters and things of which these witnesses testified were for the most part not of recent occurrence, but took place at different times while the defendant and wife were living in the state of Minnesota and thereafter in Cedar Rapids, and before they moved to the farmhouse where the woman met her death. Upon the admission of this testimony error is assigned.

Concerning the testimony of the young child's statements to his grandmother, we think it should have been excluded; but, were this the only exception in the record, we should hesitate to hold that prejudicial error was shown, for it appears that the defendant's motion to strike this evidence was taken under advisement, and the record discloses no ruling nor any demand therefor.

The propriety of the court's ruling admitting proof of statements made by the wife in conversation with others, and not in the presence of the defendant, charging him 2. SAME: hearsay. with specific acts of personal violence, abuse, and neglect, presents a graver question. In support of the ruling, counsel for the state cite us to the authorities holding that upon a charge of this nature, and especially where a husband is accused of killing his wife, it is competent to show previous and repeated threats and acts of violence and abuse on his part toward the deceased as tending to show malice and motive and a state of mind and purpose which may naturally develop a murderous intent. We may concede that the precedents cited do announce this rule, and that within proper limitations the rule stated is eminently sound; but it does not cover the objection raised by the appellant. The rule relied upon by the state does no more than declare that such facts may be proved; but it announces no new or exceptional rule as to the admissibility of evidence by which such proof may

be made. What the court below held, and what the state asks us to approve, is that such abuse and ill treatment need not necessarily be shown by the testimony of witnesses having any knowledge thereof, but by mere hearsay—the statements of witnesses who claim to have heard the deceased in her lifetime and not in the presence of her husband make such charges against him. We are cited to no authority that goes to this extent.

To be admissible as evidence against the accused, the statements must be so immediately connected with the alleged crime as. to be a part of the *res gestae*. None of the testimony now under consideration is of that character. The incompetency of hearsay testimony is such an elementary proposition in the law of evidence that citation of authorities is uncalled for. It is true this is a rule to which there are several well-defined real or apparent exceptions; but none of them is broad enough· to include a case like the one now under consideration. Its inadmissibility arises from its essential nature. Its very name or definition presupposes some better testimony which ought to be produced. Except as it may fall within the *res gestae* rule, such evidence is intrinsically weak and fails to satisfy the impartial mind. It affords a cover to fraud and gives to an unsworn statement of one person of matters which are repeated by another, whose bias or failure to understand or whose imperfection of memory may vitally affect its real meaning and import, the same dignity and quality which we give to testimony taken under oath in a solemn judicial proceeding. This is inconsistent with the fundamental principles upon which justice is administered by the courts. *Queen v. Hepburn*, 7 Cranch, 290 (3 L. Ed. 348). To a man on trial for his life or liberty it is a legal right of the very highest value that he shall be tried according to the established law of the land and upon competent evidence. When these landmarks are ignored, the most sacred privileges and immunities of citizenship are

potentially exposed to destruction. That this evidence was extremely prejudicial to defendant is too clear for argument. This will be more particularly apparent when we say that no witness was produced who undertakes to say that he or she ever heard the defendant threaten the deceased with injury or saw him strike her or otherwise inflict personal injury upon her. In our judgment a conviction thus obtained should not be permitted to stand.

It is argued for the state that, even if this evidence is incompetent, there is no error in its admission because it was given upon redirect examination after defendant's counsel upon cross-examination had asked Mrs. Mendenhall whether, during a period of two weeks when defendant and his wife had lived in her family, the deceased had not spoken kindly of her husband, and whether she made any complaint to the witness. To the first question the witness answered, "Part of the time she did," and to the last, "Well, I don't know as she did—just any complaint." This, it is said opened the door and authorized the prosecution to prove that on other occasions and at other times, as well as to other witnesses, deceased had related stories of abuse which she had suffered at defendant's hands. It seems hardly necessary to say that there is no merit in this proposition. Had counsel on cross-examination brought out part of a given conversation, it is possible the state might have been entitled to offer the omitted portion. But there is nothing of the kind here. Moreover, counsel's question to the witness was simply whether the deceased at that time "made any complaints," but did not ask her to relate such complaints, if any were made. Even had the witness, in answer to this question, proceeded to relate matters of incompetent hearsay, defendant would have been entitled to have them stricken out. *State v. Osborne,* 54 Or. 289 (103 Pac. 62, 20 Ann. Cas. 627).

II. There was, of course, no burden upon the de-

fendant to show that his wife died of suicide; but, being charged with her murder, it was clearly his right, and a most important one, to show the fact of suicide if able to do so, either by direct evidence, or by circumstances from which the inference could fairly be drawn, and if the jury could be thereby convinced that the deceased took her own life, or if. the evidence thereof made suicide so probable as to create in the minds of the jurors a reasonable doubt of the defendant's guilt, it would entitle him to an acquittal. To that end he relied in part upon the physical condition and surroundings in which the dead body was found by the witnesses. This theory he sought to strengthen as follows: He placed upon the witness stand physicians who had treated the deceased or had been consulted by her a short time before her death. These witnesses were asked whether they had treated the deceased professionally, the nature of her ailment, and whether in fact she was not suffering from nervous disorders or disease. Answers to all these inquiries were excluded upon objection of the state. Two or more other witnesses of her acquaintance were also asked concerning conversations with deceased; whether she had not on different occasions, and within a short time prior to her decease, discussed the question of suicide; whether on such occasions she threatened to kill herself; what reason or cause she assigned for such threats; and the times and circumstances under which the threats, if any, were made. Answers to each and all of these interrogatories were also ruled out. The correctness of these rulings is challenged.

But few authorities bearing directly upon this question have been called to our attention, and the list has not been greatly enlarged by our own investigation. These precedents are more or less inharmonious. Prof. Wigmore, with his usual directness and clearness, sustains the admissibility of such testimony, saying: "If the deceased

3. SAME: defense of suicide: evidence.

with whose death defendant is charged committed suicide, obviously the defendant could not have killed the deceased. There ought to be no doubt of the admissibility of plans or desires to commit suicide even where no other evidence of its particular probability or feasibility is offered. Its improbability or nonfeasibility should be matter of rebuttal and should not exclude evidence of its probability. That the evidence may be manufactured is no reason for its exclusion, for it may also *not* be manufactured, and if not it is most cogent. The distance in time ought not to exclude the evidence of plans, for it does not exclude evidence of defendant's threats." 1 Wigmore's Evidence, section 143.

The principal authority relied upon by the state in this case is *Siebert v. People*, 143 Ill. 571 (32 N. E. 431), where the exclusion of such evidence was approved on the ground, apparently, that it was hearsay and not a part of the *res gestae*. Most of the authorities cited by that court in support of its rulings go no further than to announce the general and admitted rule that evidence which is merely hearsay is incompetent, and that matters admissible as *res gestae* must be such as occur at the time or in immediate connection with the commission of the crime. The inconclusive character of these precedents is not in the merits of the rules thus cited, as abstract propositions, but in the assumption that the tesimony here offered comes within the scope or operation of such rules. It may be admitted that the declarations of the deceased are not *res gestae*. It may also be admitted that if hearsay, and not within the limits of some recognized exception to the hearsay rule, they should be excluded. It is to be remembered, however, that the primary purpose of such testimony is not to establish the truth of the statement offered, but to show the mental condition and inclination of the person making it, and as such it constitutes a well-recognized exception to the general hearsay rule. Dis-

cussing the exceptions to this rule, Mr. Wigmore says:
"The existence of a design or plan to do a specific act is
relevant to show that the act was probably done as planned.
The design or plan, being thus in turn a fact to be proved,
may be evidenced circumstantially by the person's con-
duct.   But as a condition of mind the plan may also, it
is clear, be evidenced under the present exception by the
person's own statements as to its existence.   The only
limitations as to the use of such statements (assuming the
fact of the design to be relevant) are those suggested by
the general principle of this exception, namely, that the
statements must be of a present existing state of mind and
must appear to have been made in a natural manner and
not under circumstances of suspicion."    3 Wigmore's
Evidence, section 1725.

The author himself expressly cites this rule as appli-
cable to cases of alleged murder where there is a possibility
of suicide.   See volume 1, section 143, above cited.   Re-
ferring to the *Siebert* case, *supra,* it is to be observed that
the court cites in favor of its conclusion the decision in
*Commonwealth v. Felch,* 132 Mass. 22, failing to note
that the *Felch* case had very shortly before that date been
overruled on this point and the admissibility of such
evidence affirmed.   See *Commonwealth v. Trefethen,* 157
Mass. 185 (31 N. E. 961, 24 L. R. A. 235).   It also fails
to refer to its own former holding in *Jumpertz v. People,*
21 Ill. 408 where the competency of evidence of state-
ments of the deceased showing her predisposition to suicide
or otherwise seems to be conceded. In none of the decided cases
is the principle better discussed or the authorities more dis-
criminatingly examined than in the *Trefethen* case, *supra.*
Without attempting to embody all its reasoning herein,
we quote a few sentences indicating the logical basis of the
views there expressed.   In that case some of the circum-
stances of the death of a woman alleged to have been
murdered had a tendency to show suicide, and in admitting

proof of her prior declarations or threats of self-destruction the court says: "The burden was on the commonwealth to prove beyond a reasonable doubt that the defendant killed the deceased, and to do this the jury must be satisfied beyond a reasonable doubt that she did not kill herself. The nature of the case proved by the commonwealth was such that it was not impossible that she had committed suicide. If it could be shown that she actually had an intention to commit suicide, it would be more probable that she did in fact commit it than if she had no such intention. . . . The fundamental proposition is that the intention in the mind of a person can only be shown by some external manifestation, which must be some look cr appearance of the face or body or some act or speech, and that proof of either or all of these for the sole purpose of showing the existing state of mind or intention of the person is proof of a fact, from which such state of mind or intention may be inferred." This conclusion the court further says is sustained by the "weight of modern authority." In *Blackburn v. State*, 23 Ohio St. 146, declarations or threats indicating suicidal purpose, made six years before the death of the person alleged to have been murdered, were held to be admissible; the remoteness of time going only to the weight and not to the admissibility of the evidence. In *Boyd v. State*, 14 Lea, 161, it was held by the Tennessee court that, in the absence of direct evidence of the alleged crime, it was competent for the defendant to show the suicidal disposition and intention of the deceased. In *Cowper's Trial*, 13 How. St. Tr. 1166, evidence was admitted that deceased was of a melancholy and depressed disposition and had made statements indicating her contemplation of death. A similar rule was applied in *State v. Asbell*, 57 Kan. 398 (46 Pac. 770). See, also, *People v. Conklin*, 175 N. Y. 333 (67 N. E. 624), where the court says of an offer of evidence that the deceased, three years prior to her death, had stated her in-

tention to commit suicide: "We think this testimony, though quite remote, was admissible on an issue of fact involving the question whether the deceased took her own life, or her death was caused by the act of the defendant." And see *People v. Gehmele*, 1 Sheld. (N. Y.) 251; *Shaw v. People*, 3 Hun (N. Y.) 272.

This court does not seem to have had occasion to pass upon the question here presented until now; but we are persuaded that the competency of such testimony, in cases like the one at bar, has the support of the sounder reasoning and the better considered precedents. We therefore hold that the trial court erred in sustaining the objection to its admission.

We may further add that, as the state relied upon the alleged want of harmony in the defendant's family and his alleged brutal treatment of his wife as tending to

4. SAME: rebuttal evidence.

show evil motive and malice on his part, it was also competent for him to rebut that inference, if he could, by testimony of witnesses who had been in his home, that the relations existing between him and his wife were apparently affectionate, harmonious, and kind. All such evidence was ruled out on the trial below.

We think it unnecessary, however, to burden this opinion with further recitation or discussion. Another trial must be ordered, and we may assume that the errors which we have mentioned will be avoided on a re-trial.

For the reasons stated, the judgment and verdict of conviction will be set aside, and cause remanded for a new trial in harmony with the views herein expressed.— *Reversed.*