## Commonwealth *v.* Jordan, Appellant.

440

Argued December 2, 1937. Before Schaffer, Maxey, Drew, Linn, Stern and Barnes, JJ.

*Alexander Perry,* for appellant.

*Charles C. Gordon,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

Opinion by Mr. Justice Stern, January 3, 1938:

Defendant appeals from a conviction of voluntary manslaughter. His chief complaint is that the evidence did not establish guilt on his part. This contention is not tenable, as a summary of the facts which the jury would have been justified in finding will demonstrate.

John Coles and Fletcher Williams worked in or around the Paramount Court garage, where the murdered man, Norman Bechtel, kept his automobile. Oliver Armstrong roomed with defendant, William Jordan, whose occupation was that of chauffeur. On the after-

noon of January 19, 1932, defendant, Coles and Armstrong were drinking together in a speakeasy conducted by Lucille Scott. About four o'clock Williams came there in a Buick car owned by his employer, and drove the three men to the Paramount Court garage because Coles wanted to "get some money." Coles entered, stayed a few moments, and then they all went back again to the speakeasy, where they indulged in more drinking until about ten o'clock, when the four men and Lucille Scott drove in the Buick car to Wissahickon and Westview Avenues, Williams at the wheel and Coles directing. At that point Coles ordered Williams to stop, and Coles and Armstrong got out of the car. Williams made a U turn and headed south on Wissahickon Avenue. Bechtel, who had been in his own car to a church meeting and from there had taken two friends to their respective homes, came driving south on Wissahickon Avenue. Coles and Armstrong, who were standing in the street, hailed him and he came to a stop about fifty feet south of the Buick car in which defendant, Williams and Lucille Scott were seated. It was then near midnight. Coles advanced to the right of Bechtel's car and Armstrong to its left running board. An "argument" ensued between Bechtel and Armstrong. Armstrong, reaching into the car, struck Bechtel repeatedly with a knife, inflicting a great number of savage wounds. Coles re-entered the Buick car, while Armstrong got into the Bechtel car, pushed the dying man from the wheel, told those in the Buick car to follow him, and drove into the driveway of an adjoining estate, where he pulled Bechtel out of the car and laid him upon the ground. All of this was seen by the occupants of the Buick car by means of its headlights. Armstrong drove off in the Bechtel car. The Buick car followed him so that when he "ditched" the Bechtel car at some remote point the others could pick him up. The two cars crossed the Schuylkill, where defendant saw Armstrong throw his knife into the river.

Armstrong drove so fast that Williams, who was operating the Buick car, lost sight of him, but Coles said he knew where Armstrong was going and they drove to a garage in West Philadelphia where they again met Armstrong, who had meanwhile "ditched" Bechtel's car. Armstrong entered their car and they went back to the speakeasy; there they again started to drink, Armstrong paying for the liquor. Defendant went home about four or five o'clock in the morning. Bechtel died a few hours after the stabbing. Defendant, Williams, Coles and Lucille Scott were not arrested until about five years later, Armstrong meanwhile having died. An indictment was found against the three men and the woman, but, a severance being granted, defendant Jordan was tried alone.

There are additional facts of importance. Defendant admitted that the meeting of the two automobiles at Wissahickon and Westview Avenues was not merely a coincidence, but that Coles had made an "appointment" with Bechtel. There was also evidence that when Bechtel took his car from the garage to attend the church meeting, he bought some gasoline, and in paying for it pulled out a "red pigskin" wallet from his pocket. When he was taken by the police to a hospital almost immediately after the attack upon him there was no wallet upon his person. According to defendant, Armstrong took the wallet and scratched Bechtel's name from it, and it was with the contents, amounting to about $75, that they went back to the speakeasy and purchased liquor. Bechtel also had carried a watch and chain, but when he was discovered lying on the ground the watch and part of the chain were gone, only a portion of the chain remaining fastened in the buttonhole of his vest. According to defendant, the watch and the part of the chain attached to it were pawned by Armstrong at a shop on Ridge Avenue.

Practically all the evidence in the case consisted of oral statements and two written confessions signed by

defendant. He claimed that these were obtained from him by physical violence and duress, but this was denied by the police authorities.

From the foregoing recital it is obvious that the jury could properly have found that the murder of Bechtel was committed in the perpetration of a robbery. Defendant contends, however, that the evidence was not sufficient to make out a case against *him*. He testified that when he started out with the others on the automobile trip he did not know its purpose but understood that it was to take a ride. But when we link together the admissions made by him, and the significant aspects of the case emerge, there would seem ample justification for the conclusion that defendant knew the real object of the expedition and accompanied the others for the purpose of aiding and abetting therein. They were all more or less acquainted with Bechtel; they started drinking together; they first went to the garage where he stored his car in order "to get some money"; they went later on a ride that, from all the circumstances attending it and the manner in which it was conducted, obviously had a definite destination and a criminal purpose; Coles had an "appointment" with Bechtel and directed the course of the car to Wissahickon and West-view Avenues where he ordered it stopped; thereafter Bechtel came to this same spot; Coles and Armstrong were out in the street apparently waiting for him; they hailed him and immediately proceeded to either side of his car; the stabbing thereupon followed; Bechtel's wallet and watch were taken from him; all this not only took place in front of defendant, Williams and Lucille Scott, but, save for an exclamation from the woman, elicited from them not the slightest surprise or opposition; those in the Buick car then followed Armstrong to assist him in getting rid of Bechtel's car, and later met him in pursuance of what must have been a prearranged understanding between at least Coles and Armstrong; they then all used the money

taken from Bechtel to buy more liquor and to continue their drinking at the speakeasy. These facts would reasonably warrant a jury in believing beyond a reasonable doubt that the expedition was planned by the group, or at least that they were all cognizant of its purpose, that they accompanied one another for the purpose of accomplishing it, and that defendant's complicity was sufficiently established to constitute him a principal in the second degree, that is, an abettor present at the commission of this brutal murder, participating in it to the extent of assisting therein if necessary, giving aid and comfort to the one who inflicted the fatal wounds, and thereby rendering himself as responsible as Armstrong himself for the consequences of the latter's act. Although the Commonwealth, at the trial of the case, disclaimed the intention of prosecuting defendant for murder of the first degree, he could, under the evidence, have been convicted of that crime, and he cannot complain, therefore, that the jury found him guilty only of voluntary manslaughter. In *Commonwealth v. Mendola,* 294 Pa. 353, 356, 357, the court said: "There were circumstances supporting the Commonwealth's contention that Bonita and the defendant were acting in concert and entered the offices in question intending to commit unlawful violence therein, and that the latter was a principal in the second degree to the homicide committed by the former. The jury adopted that view so far as to convict the defendant of voluntary manslaughter and he cannot complain because the evidence may have suggested a higher degree of crime."

Unfortunately for the Commonwealth, a new trial must be granted to defendant because of errors committed by the court in the presentation to the jury of the two main factual issues involved. The first of these issues was in regard to defendant's confessions, as to which considerable testimony was taken concerning the manner in which they had been obtained. The learned

trial judge in his charge said: "Of course, if the statement was not voluntary, it does not represent admissible evidence in a criminal court. If it was obtained by duress or physical abuse and violence, and was made only for the purpose of stopping the abuse on the part of the police, *and* if it was not the truth because of this physical violence, then it should not be given any consideration at all. But if the statement represents the truth about the facts and if the facts related in it are true, then this man is in the best position in the world to tell what the truth is about the facts, because if the statement is true he is one of the people who were there and he knows what went on. *If you believe the statement to be the truth,* you should give it such consideration as you believe it deserves in this case." At the conclusion of the charge counsel for defendant said: "With all due respect to the court, the jury should be instructed as to the statement. They must first determine whether or not the statement was voluntary or involuntary before they can determine whether or not it is true." The court then further instructed the jury: "Of course, you have to consider first whether or not the statement was made voluntarily, and you have to consider whether or not the statement is a true recital of what occurred. If it was not voluntarily made, *and* is not the truth, do not consider it." At best, this was ambiguous. It lends itself easily to the interpretation that whether the confessions were made voluntarily or involuntarily the jury should consider them if they believed the facts stated therein to be true. Of course, if thus understood by the jury, the instruction would be contrary to law, because, unless the statements were voluntary, the jury would have no right to consider them at all. Indeed, since there was no other testimony in the case by which it could be determined whether they were true or otherwise, the jury would have no means of making such determination if the confessions were involuntary and therefore of no evidential value.

The second principal issue of fact was in regard to the defense of alibi. Defendant testified that for a period of four months, beginning with Christmas week of 1931, he was afflicted with septic arthritis, that his leg was swollen to double its normal size, that he could not walk upon it, and that he was confined to his bed during that entire period. He was corroborated by his wife, who testified that he was in bed continuously from at least as early as January 1, 1932, until the first or second week in March, and, in answer to the specific question as to his whereabouts at midnight of January 19, 1932, when the murder was committed, she said she was with him in bed in their apartment, which was several miles distant from the scene of the murder. There was also testimony on the part of defendant's sister-in-law, his doctor, a friend, and the representative of an insurance company, all corroborative, to some extent, of defendant's alibi. The learned trial judge summarized this testimony, but gave no instruction as to its legal significance or the probative standard by which it should be measured. Defendant's counsel objected to the inadequacy of the charge on the subject of alibi, but no additional instructions were given in that regard.

The law is firmly established that the measure of proof required for the defense of alibi is merely a preponderance of the evidence, or, as it is sometimes stated, proof "to the satisfaction of the jury." Even if not thus proved, however, the evidence in support of the alibi may, with the other facts in the case, raise the reasonable doubt of guilt which entitles a defendant to acquittal: *Rudy v. Commonwealth*, 128 Pa. 500, 507, 508; *Commonwealth v. Andrews*, 234 Pa. 597, 604; *Commonwealth v. Delfino*, 259 Pa. 272, 279; *Commonwealth v. Barrish*, 297 Pa. 160, 169, 170, 171; *Commonwealth v. Stein*, 305 Pa. 567, 570, 571; *Commonwealth v. Duca*, 312 Pa. 101, 110, 111, 112, 113. It is equally well settled that, where an alibi defense is presented, a failure, *even in the absence of a specific request,* to instruct the jury

as to the degree of persuasion required is reversible error, for the reason that the jury is not furnished with a standard for determining the legal value of the evidence. "The defendant had a right, even though no request was made for the instruction, to have the jury fully advised as to the difference between the burden resting upon the Commonwealth to establish guilt, and that resting on the defendant with respect to the alibi set up": *Commonwealth v. Andrews,* supra, p. 604. "The law of our State requires specific instructions to be given relative to the burden of proof in an alibi, and the degree of persuasion necessary to support a conclusion that the accused was not at the place where the crime was committed. . . . In viewing this testimony as arrayed against the Commonwealth's case showing guilt, the court should instruct the jury as to its nature, its purpose and the degree of persuasion necessary to establish it. . . . To permit evidence of an alibi to be considered by the jury without some instruction as to its probative value or the degree of persuasion necessary before it attains any value, would introduce a false note in the case, as it would permit the jury to adopt their own idea of its worth; they would have no standard to determine its effect": *Commonwealth v. Barrish,* supra, 167, 168, 169. "Where a human life is at stake, the jury should have explained to them, not alone what an alibi is, but how the testimony which the accused offers tends to sustain it, provided it does": *Commonwealth v. Westley,* 300 Pa. 16, 20, 21. "The trial judge entirely neglected to instruct the jury that defendant need prove her alibi only 'by a preponderance of the evidence' . . . or by 'satisfactory proof' . . . or by any other equivalent. Our cases uniformly hold that such an omission requires us to award a new trial. . . . We need not consider whether this rule must be more strictly applied in capital cases than in others, as the Commonwealth contends, for here we are faced with an utter and complete disregard of it—an omission this court, under no

circumstances, can condone. . . . In view of defendant's right, even in the absence of a request for such instruction, to have the jury fully advised as to the burden of proof resting on defendant with respect to the alibi, and the difference of that burden from the burden resting upon the Commonwealth to establish guilt, . . . we must hold that, in his failure to mention to the jury the important difference between that burden and the quantum required of defendant, he fell into error": *Commonwealth v. Stein,* supra, 570, 571, 572. "He [the trial judge] also instructed the jury generally on the subject of alibi, but failed to give any instruction whatever as to the quantum of proof required upon the part of the defendant to establish his alibi. This was clear error which requires a reversal of the judgments and the granting of a new trial . . .": *Commonwealth v. Brletic,* 113 Pa. Super. Ct. 508, 518. "The jury should have been informed that the defendant need only prove an alibi by a preponderance of the evidence. This failure was a fatal oversight": *Commonwealth v. Trygar,* 121 Pa. Super. Ct. 525, 528. See also *Commonwealth v. Yancer,* 125 Pa. Super. Ct. 352, 354, 356.

The necessity of granting a new trial in this case leaves the record in an extremely unsatisfactory condition. Defendant, upon a retrial, cannot be convicted of murder, but only of the lesser grade of homicide of which the jury found him guilty. Since, however, as has been pointed out, he could, under the evidence, have been found guilty of the greater crime, he is not entitled now to be discharged merely because on a retrial he can be convicted only of a lesser offense involved in the indictment for murder.

The judgment is reversed and a new trial awarded.