Commonwealth *v.* Donough, Appellant.

Argued January 4, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*L. E. Meyer,* with him *James R. Whitman* and *Meyer, Brubaker & Whitman,* for appellant.

*William H. Egli,* District Attorney, with him *G. Thomas Gates,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, March 25, 1954:

Defendant was convicted of voluntary manslaughter, and was sentenced to not less than 6 years nor more than 12 years imprisonment. He alleges numerous errors in the charge of the Court as well as errors pertaining to suicide. The only material facts concerning what took place at or about the time of the death of Mrs. Irene Carpenter Krochell came from the statements or a confession or testimony of defendant.

Defendant, a married man with several children, was having a couple of beers at a diner when Mrs. Krochell came up to him and started talking. After some drinking she invited him up to her room at the Stratford Hotel, where he got a room close to hers. After going to his room, they then went into her room which was several doors away. She immediately undressed and lay down on the bed, and they then had intercourse. After that, she left the room to go down to the hotel lobby to get a book or a paper, having first put on a thin nightgown and a coat over it. Defendant returned to his room but about 5 minutes later saw Irene pass by and went over once more to her room. She was lying on her bed in her nightgown reading a gray-colored book. He then attempted to again have

intercourse with her. She jumped up, got to the end of the bed when he grabbed her and asked her to again have intercourse. She said, " 'Nothing doing, Harold' . . . *'If you don't have enough, I am going to jump out the window.'* "*

"Well, I told her, *'Well, I will go home then.'* So as we parted there she went toward the window and I seen that she had lifted up the window, *and I backed out the door.* When I opened the door ready to back out, I took notice she was hunched at the window . . . So I thought, well, she is just fooling or something; so I closed the door . . . I went over to my room, . . . sat down on my bed . . . about four, five minutes and I thought, well, I will go over. I tried the door knob and at first it didn't open up. So I gave another harder twist and then it opened up. When I opened the door I seen that the window—she was not there. So right there I got frightened and I fled. . . ."

Defendant's testimony was quite different from a prior confession and several prior conflicting statements he had made from which the jury could have believed that he wilfully and intentionally killed Irene either with premeditation or with malice or in resentment and anger. The material part of his confession is as follows:

"I, Harold Groy Donough, make this statement in the office of and in the presence of William H. Egli, the District Attorney of Lebanon County, G. Thomas Gates, the Assistant District Attorney, Lt. Roy Kirst, Sgt. Abe Wills, Detective Lloyd Wood" (Wolfe) "and Susan Flindell, the District Attorney's Stenographer. I make this statement freely and voluntarily without force, threats or intimidation and without any special promises but with the thought to clear up the mystery

---

* Italics throughout, ours.

regarding the death of Irene Krochell . . . we had intercourse . . . Then she left for the hotel lobby with a gray coat on. In a few seconds she was back with a book. Then we sat and she started talking about her husband. She said 'he is over in Korea'. That she hopes he gets shot because she don't like him. Then . . . I asked her again to have another intercourse, she said 'no', she had enough. Then we started to tussle. Then we were tusseling a little bit and fighting . . . She fought, pulling away. I had a hold of her waist, while we were tusseling. Then she flew back against the window, bumped her head somewhere on the window, and I thought she was dead. Her body partly laid out the window. *I crawled over, got underneath her arms, pulled her down to the roof, then got hold of her wrist, dragged her on her back* until I almost fell off the roof and *just rolled her over the roof.* I believe she hit her head on the side of the windowsill. I ran out of the room closed her door and mine, ran down the hallway, through the front entrance, got my truck and went home. I was home approximately around 2:30 a.m., November 7 . . .

"I pulled Irene's body over to the edge of the roof and *pushed her off the roof to make it look like she had committed suicide herself* . . .

"I have made the above statement voluntarily as above stated and it represents my version of what happened on the morning of November 7. Before I signed the statement I read it over and know that it correctly states my story, knowing that the same may be used against me."

Irene was found that morning at 10:30 A.M. lying on the ground at a point directly under her window and under that part of the roof where defendant in his confession stated he had rolled her. She was and remained unconscious until her death several days

later. She had a fracture of her right wrist and right arm, abrasions over her face and body, a fractured pelvis, hemorrhages of the liver, the spleen, and in the adrenal gland, small hemorrhages in and concussion of the brain, all caused by trauma and all of which caused or contributed to her death. She was wearing a furry or gray coat, over a white sheer nightgown, and was lying on her stomach with her face down. She had cinders in her eyes, nose and mouth, but not on her feet, which she probably would have had if she had jumped to her death.

Defendant, aided by the ingenuity of counsel, contends (a) that his testimony at the trial showed that Irene committed suicide; (b) that his prior written confession (which he said he made at a time when he didn't feel right) showed that her death was accidental; and since this constituted the only material evidence of her death (c) the evidence was not sufficient to convict him of voluntary manslaughter. The basic fallacy of defendant's contentions is that he assumes a jury must believe all or none of his testimony or confession. Of course, this is not the law.

In *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A. 2d 743, where the defense was suicide, the Court said (page 153): "Defendant, like most defendants, proceeds on the assumption that you must believe all of his statements or confessions; of course, that is erroneous; a jury can believe all or a part of or none of a defendant's statements, confessions or testimony. . . ."

If suicide were an affirmative defense such as self-defense, insanity or alibi, the defendant would have the burden of establishing it by a fair preponderance of the evidence: *Com. v. Noble*, 371 Pa. 138, 142, 88 A. 2d 760; *Com. v. Johnson*, 372 Pa. 266, 282, 93 A. 2d 691; *Com. v. New*, 354 Pa. 188, 47 A. 2d 450; *Com. v. Burns*, 367 Pa. 260, 80 A. 2d 746; *Com. v. Ross*, 266

Pa. 580, 110 A. 327; *Com. v. Molten*, 230 Pa. 399, 79 A. 638; *Com. v. Deitrick*, 218 Pa. 36, 66 A. 1007; *Com. v. Gerade*, 145 Pa. 289, 22 A. 464; *Meyers v. The Commonwealth*, 83 Pa. 131; *Com. v. Bryson*, 276 Pa. 566, 120 A. 552; *Com. v. Weinberg*, 276 Pa. 255, 120 A. 406; *Com. v. Iacobino*, 319 Pa. 65, 178 A. 823. While there are no appellate Court decisions in Pennsylvania on this question and the authorities elsewhere are few and divided, we believe that the better view is that suicide, like accidental death, (see: *Com. v. Kluska*, 333 Pa. 65, 3 A. 2d 398; *Com. v. Deitrick*, 218 Pa., supra; *Com. v. Lockett*, 291 Pa. 319, 324, 139 A. 836) is not an affirmative defense and there is no burden of proof upon the defendant on this issue: cf. 40 C.J.S., §197, page 1098. The Commonwealth in this case—and, it seems necessary to repeat, in every case which requires a criminal intent, even though an affirmative defense is presented—has, of course, the burden of proving that the defendant is guilty of the crime charged beyond a reasonable doubt. *Rudy v. Com.*, 128 Pa. 500, 18 A. 344; *Com. v. Jordan*, 328 Pa. 439, 446, 196 A. 10; *Com. v. New*, 354 Pa., supra, 215; *Com. v. Noble*, 371 Pa., supra, 143; *Com. v. Sallade*, 374 Pa. 429, 433, 97 A. 2d 528; *Turner v. Com.*, 86 Pa. 54, 74; *Com. v. Mills*, 350 Pa. 478, 484, 485, 39 A. 2d 572; *Com. v. Barrish*, 297 Pa. 160, 146 A. 553.

A variety of definitions of "reasonable doubt," all expressing substantially the same thought, have been approved by the appellate Courts—See *Commonwealth v. Kluska*, 333 Pa. 65, 3 A. 2d 398. A standard and approved form of charge on this point would be: "The defendant comes before you presumed to be innocent and the burden is upon the Commonwealth to prove his guilt beyond a reasonable doubt. A reasonable doubt cannot be a doubt fancied or conjured up in the minds of the jury to escape an unpleasant verdict; it

must be an honest doubt arising out of the evidence itself, the kind of a doubt that would restrain a reasonable man (or woman) from acting in a matter of importance to himself (or herself)." The trial Judge's charge paraphrased these words and was even more favorable to the defendant than we believe he should be entitled to. We therefore find no error in the Court's charge to the jury on this point.

There is absolutely no merit in defendant's contention that the evidence was not sufficient to justify a conviction of voluntary manslaughter. Cf. *Commonwealth v. Homeyer*, 373 Pa., supra; *Commonwealth v. Colandro*, 231 Pa. 343, 80 A. 571; *Commonwealth v. Palermo*, 368 Pa. 28, 81 A. 2d 540.

In *Commonwealth v. Palermo*, 368 Pa., supra, the Court said (page 30) : " 'Voluntary manslaughter is a homicide intentionally committed under the influence of passion.' Commonwealth v. Colandro, 231 Pa. 343, 350, 80 A. 571 (1911) ; Commonwealth v. Cargill, 357 Pa. 510, 513, 55 A. 2d 373 (1947). . . ."

In *Commonwealth v. Colandro*, 231 Pa. 343, 80 A. 571, the Court said (page 350) : " 'Voluntary manslaughter is a homicide intentionally committed under the influence of passion. . . . :' 21 Am. & Eng. Ency. of Law (2d ed.), 172. 'The term "passion" as here used includes both anger and terror provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected :' 21 Am. & Eng. Ency. of Law (2d ed.) 173. 'Passion, as used in a charge defining manslaughter . . . . means any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection ;' 6 Words & Phrases, p. 5227. 'Although "anger" is the passion usually existing in cases of this class, yet any other passion, as sudden resentment or terror,

rendering the mind incapable of cool reflection, may reduce the grade of the crime:' 21 Cyc. 737. . . ."

Defendant also quotes isolated portions of the charge as constituting reversible error. He made no objection thereto at the time nor did he request any amplification of the charge. Moreover, when asked by the Court at the conclusion of its charge whether counsel desired further instructions he made no such request.

In *Com. v. Barnak*, 357 Pa., supra, this Court, speaking through Mr. Chief Justice MAXEY, said (page 406) : "We also said in Commonwealth v. Schurtz, 337 Pa. 405, 411, 10 A. 2d 378 : 'Isolated excerpts torn from the heart of the charge cannot be considered apart from the context, and if the whole is accurate and fair, as it was in this case, the parts objected to do not form a proper basis for reversal.' This same principle was enunciated by this Court in Com. v. Glenn, 321 Pa. 241, 183 A. 763; Com. v. Becker, 326 Pa. 105, 191 A. 351; Com. v. Stelma, 327 Pa. 317, 192 A. 906." The same principle was reiterated in *Com. v. Patskin*, 372 Pa. 402, 422, 93 A. 2d 704; *Com. v. Moyer*, 357 Pa. 181, 187, 53 A. 2d 736; *Com. v. Holley*, 358 Pa. 296, 302, 56 A. 2d 546; *Com. v. Cargill*, 357 Pa. 510, 513, 55 A. 2d 373; *Com. v. Almeida*, 362 Pa. 596, 600, 68 A. 2d 595. We have carefully read the Court's charge and find no basic or prejudicial or reversible error therein.

Defendant has another contention which he vigorously presents, namely, that the trial Court committed reversible error in refusing his offer to show by a witness "that the decedent applied for a job at this restaurant a week and a half before [her death]; that she was refused the job; that she talked about her history and about her being no good and her intention of doing away with herself."

Defendant relies upon *Com. v. Santos,* 275 Pa. 515, 119 A. 596. In that case the Court said (pages 521, 523, 525) : "(e) The great weight of authority and reason demand that, in a trial for homicide where self-destruction of deceased is set up as a defense, the accused should be permitted to introduce declarations, made by the alleged victim, reasonably close to the time of her death, evincing an intention to take her own life; and particularly is this true where, as in the present case, the circumstantial evidence is consistent with the defense: Com. v. Trefethen, 157 Mass. 180, 188, 31 N. E. 961 (overruling a prior decision to the contrary) ; State v. Kelly, 77 Conn. 266, 268, 58 Atl. 705; Nordan v. State, 143 Ala. 13, 26, 39 So. 406; Boyd v. State, 82 Tenn. 161, 175; Blackburn v. State, 23 Ohio St. 146, 165; State v. Ilgenfritz, 263 Mo. 615, 632, 173 S. W. 1041 (overruling some earlier decisions; see Ann. Cas. 1917 C, 366) ; State v. Beeson, 155 Ia. 355, 362, 136 N. W. 317; Ann. Cas. 1914 D, 1275; People v. Conklin, 175 N. Y. 333, 343, 67 N. E. 624, 627; Wigmore on Evidence, section 143 . . . the weight of judicial authority is that the trial judge has wide, though not absolute, discretion to refuse to admit declarations of intended suicide, if he considers them too remote: Com. v. Trefethen, supra; People v. Conklin, supra; State v. Kelley, supra; Hale v. Life, Ind. and Investment Co., 65 Minn. 548, 551 . . . we must put ourselves in the position of the trial judge at the time the offer under consideration was made, and, in order to decide the admissibility of the testimony tendered, we must look at all evidential matters then on the record in such light, favorable to the defendant, as it is reasonably conceivable the jury might have viewed them, in connection with the proffered testimony, had it been received. . . ."

The facts in that case were quite different from the facts in the instant case. Santos was indicted for the murder of Kate Nadab and her small boy. Santos called at the Nadab home and shortly afterwards several shots were heard. Kate and her son were shot to death and Santos was wounded in the head. The defense was that Kate had shot him and the child and then committed suicide. Defendant at the trial offered to prove that Kate had a conversation with the witness within three weeks of her death in which she stated that "unless [Santos] mended his ways and ceased from cheating and defrauding her she would kill him, . . . and after she had killed him she would kill herself."

In the instant case the defendant told several conflicting stories of the killing. We shall briefly review the two which are most favorable to the defendant.

Defendant, in his written confession, stated that after he tussled and fought with Irene she broke away and bumped her head on the window; that her body lay against the window sill; that he thought she was dead, so he got hold of her wrist, rolled her out of the window onto the roof, and then he got out onto the roof and rolled her off the roof "to make it look like she had committed suicide herself." The jury could have found from this confession, we repeat, that defendant killed Irene and that his crime amounted to either murder or voluntary manslaughter, or the jury could have found that her death was accidental; but there was absolutely nothing to justify a contention or finding of suicide.

At the trial of the case defendant testified to a different version of how it all happened. When he tried to force her to have more intercourse, she got out of bed and he struggled with her. Finally she said, *"If you don't have enough,* I am going to jump out the

window." She went to the window and lifted it up. He then said, "Well, I will go home then."; and immediately closed the door and went to his own room. Four or five minutes later he returned to her room, and finding it empty, fled. This evidence he contended showed that she committed suicide.

If the defendant's testimony, no matter how weak or farfetched, or if the facts themselves disclose sufficient evidence of a death by suicide, testimony as to contemplated or threatened suicide would be admissible if reasonably connected and not too remote in time. But even under the version of Irene's death which was most favorable to defendant, there was no reasonable connection between a possible suicide and the proffered testimony.

Irene was calmly reading a book in bed when defendant returned to her room. She threatened, according to him, to jump out of the window—not because she had been a bad woman; not if he left the room, *which he did*; but only if he had more intercourse with her against her will, *which he didn't*. Instead of pursuing her and attempting to have more intercourse, he testified that he told her he would go home and *he immediately left the room*. There is therefore no reasonable basis for his counsel's ingenious contention that a prior statement to a possible employer that she would do away with herself if she didn't get the job, was admissible in connection with her present threat. Under these facts and circumstances we believe the Trial Judge properly exercised his discretion and did not commit reversible error in refusing the aforesaid offer of proof, because even from the viewpoint most favorable to defendant, *the proffered statement was too remotely or unreasonably connected with the events which actually or allegedly occurred.*

In the last few years murder and similar crimes of violence have multiplied and have frequently been accompanied by barbaric brutalities which have shocked America. Every person accused of crime—even an oft-convicted criminal—is surrounded by constitutional and legal safeguards and the Courts have leaned over backwards to protect his rights. Demands for new or extended rights and privileges for those accused of heinous crimes are constantly being made, with no thought for the rights, the safety, the welfare, or the protection of Society, or for the feelings or rights of the victim's bereaved family. In these days of organized crime and high powered automobiles, the Commonwealth usually has a very difficult task—first to capture and then to convict a murderer or dangerous criminal. While Courts must continue to carefully protect the constitutional and legal rights of every person accused of crime, they should likewise give careful consideration to the safety and the lives of law-abiding citizens and the protection of the community; and should not *extend,* unless legally necessary, Court decisions if they favor criminals at the expense of the public safety.

For these reasons we do not intend to *extend* the principle laid down in *Commonwealth v. Santos,* 275 Pa., supra, to the instant case.

We believe this defendant had a fair trial, and he was fortunate that he was not found guilty of murder.

We have considered all the other contentions of the defendant, but deem further discussion unnecessary.

Judgment affirmed.

Mr. Justice JONES concurs in the result.