## Meyers *versus* The Commonwealth.

1. In an indictment for murder, where the defence was insanity, it was error in the court to instruct the jury that they must be satisfied *beyond a reasonable doubt* that the prisoner was insane at the time the act was committed.

2. This instruction was too stringent and threw the prisoner upon a degree of proof beyond the legal measure of his defence, which measure is simply proof that is satisfactory; such as flows fairly from a preponderance of the evidence.

3. *Query*, as to how far a doubt in the mind of the Supreme Court of the existence of an intention to kill will, under the Act of 15th of February 1870 (Pamph. L. 15), known as the Schoeppe Act, be a ground of reversal.

4. Per Agnew, C. J.: Where a jury, who hear the witnesses and observe their conduct, take the darker view and believe the intent to kill existed, and in this view are sustained by the court below, it is a nice question how far the views of the Supreme Court of the evidence should prevail to grant a new trial.

| | |
|---|---|
| 83 | 131 |
| 128 | 508 |

| | |
|---|---|
| 83 | 131 |
| 168 | 618 |

| | |
|---|---|
| 83 | 131 |
| 202 | [1]152 |

| | |
|---|---|
| 83 | 131 |
| f218 | [1] 39 |

| | |
|---|---|
| 83 | 131 |
| f221 | [2] 13 |
| f221 | [5]473 |

| | |
|---|---|
| 83 | 131 |
| 222 | [5]298 |
| f222 | [2]301 |

| | |
|---|---|
| 83 | 131 |
| 226 | [1]285 |
| 226 | [2]286 |

[Meyers *v.* Commonwealth.]

5. Per PAXSON, J., concurring: It is the duty of a judge trying a man for his life to charge fully upon the law as applicable to the facts, without regard to points presented by counsel. The rule that a judge is not to be convicted of error for what he omits to say, ought not to be applied to a capital case. The prisoner has a right to have the jury properly instructed upon every question of law legitimately raised by the evidence, and this right he cannot waive, nor can his counsel do so for him.

November 20th 1876. Before AGNEW, C. J., SHARSWOOD, GORDON, PAXSON and WOODWARD, JJ. WILLIAMS and MERCUR, JJ., absent.

Error to the Court of Oyer and Terminer of *Allegheny county*: Of October and November Term 1876, No 257.

Indictment of Frederick Meyers, for the murder of Augustus Dorn, alias " United States Baker."

On the evening of the 29th of February 1876, as alleged by the Commonwealth, at a saloon on the corner of Third Avenue and Market street, in the city of Pittsburgh, kept by the prisoner, the latter thrust a poker, heated to " white heat," into the groin of Dorn, and thence upwards into his abdominal cavity, from the effects of which he died about two weeks thereafter.

The defence was, 1st. That, on account of the excessive and protracted use of intoxicating liquors and the taking of poison, the defendant was insane at the time of the commission of the act; and, 2d. That, having in view the circumstances of the case, the relations existing between the parties, the mental condition of the defendant, and the absence of motive, the crime had not the ingredients of murder in the first degree.

At the trial the following facts were disclosed:—

That Meyers, at the time of this fatal occurrence, was the keeper of a drinking saloon on Third Avenue, in Pittsburgh, and living with him were two women, a bar-tender and Dorn, who, in the language of one of the witnesses, " did chores about the house for what he got to eat and drink." Both Dorn and Meyers had been in the habit of drinking to excess; and during the whole of the day on which he received the injury, Dorn was in a sort of stupor, induced by drinking; while Meyers was suffering from the combined effects of a recent attack of mania potu, the contents of a bottle of rat poison which he had taken with the evident intent to destroy his life, and from repeated indulgence in whiskey throughout the day.

About 9 o'clock in the morning of the day the injury was inflicted, Meyers came out of his room into the saloon, and charged Dorn with having stolen his watch and chain, and said something about sending Dorn " to hell or across the river," (meaning the penitentiary), if he did not return them; to which it appeared Dorn, who was very drunk, said little in reply, but shortly afterwards gave the watch to the bartender. Neither party seemed to have been in anger, and the matter appeared to have been dropped finally, when Meyers ceased talking about it.

[Meyers *v.* Commonwealth.]

When the trouble about the watch was over, Dorn laid down on a bench in the saloon and went to sleep, while Meyers returned to his room.   Dorn, it appeared, went out several times through the day, evidently, as his condition indicated, for the purpose of getting more liquor; but Meyers remained in his room, coming out once to get a drink, until about 3 o'clock in the afternoon, when he came into the saloon, and sat down at a table to play "casino," for the drinks, with one of the women, Meyers winning the game, and taking whiskey for his drink.   While engaged in the game, Dorn sat down by the table and took up the woman's cards, when Meyers told him to lay them down, and upon his refusal to comply, threw the water in his glass, but seemingly not in anger, in Dorn's face, who in turn betrayed no anger, said nothing, and quietly remained sitting in his chair.

At the conclusion of the game Meyers returned to his bed, and stayed there until about 7 o'clock in the evening, when he came into the saloon again, and approaching Dorn, who was lying on the bench, told him to "get up," which Dorn did by sitting upright on the bench.   Meyers then went to the stove, and picking up the fire-poker, stuck it in a hole in the lower part of the stove, where he let it remain until the point was heated to a white heat, when, drawing it forth and flourishing it around, and, in the words of one witness, "fooling around and laughing," he advanced towards Dorn and made a thrust at him, with the fatal effects above mentioned. Dorn made no resistance nor outcry, and sat still on the bench, no one apparently thinking he was seriously hurt, until a few minutes afterwards, when one of the women hearing something, as she told it, "like a hydrant running;" upon examination it was discovered to be the blood of Dorn dripping through his pantaloons upon the floor.   Meyers, after the thrust at Dorn, laid the poker down in the coal-box, took another drink, and went back to bed.   Shortly thereafter he returned to the saloon, when one of the women said, "Fred, we had better go for a doctor," and he replied, "It is of no use," but afterwards gave her money to buy a plaster to staunch the blood.   He then helped to carry Dorn into an adjoining room, and laid him on the floor, and once more returned to his bed. Dorn was removed to the homeopathic hospital, where he died on the 16th of March 1876.   The physician of the hospital testified that the poker had penetrated about two inches, and had it not been bent it would have "gone more downward and not upward," and not have penetrated the abdominal cavity, and the injury inflicted would have been less severe.

In support of the theory that defendant was insane, it was shown that he had had a recent attack of mania a potu; that only two days before he injured Dorn he had purchased two bottles of rat poison, and drank the contents of one bottle; that he continued to drink immoderately even after he had taken the poison

[Meyers *v.* Commonwealth.]

from which he was suffering—one witness testifying that he took seven or eight drinks on the day of the homicide.

A number of witnesses testified that they believed Meyers was insane previous to and on the day of the homicide, in consequence of this excessive indulgence in strong drink and the taking of the poison, and as confirmatory of this belief gave evidence of his acts and declarations.

There was evidence also that, just before his death, Dorn had said to two witnesses, " Fred has done awful bad; but I don't think he would have done it if he had been in his right senses; had it not been for the poison and drinking; that Fred was only fooling with him; that he was crazy after he took that poison."

In rebuttal, the Commonwealth proved a number of the acts and declarations of the defendant at the time of the homicide, and the arrest of the defendant, to show that Meyers was of sound mind, and had sufficient intelligence to comprehend his situation and endeavor to evade the officers of the law; among other things declaring, " You have no right to arrest me except you show me a warrant."

The court, Kirkpatrick, P. J., in his charge to the jury, said:—

" Murder at the common law is defined and described to be, when a person of sound memory and discretion, unlawfully kills any reasonable creature in being, and under the peace of the · Commonwealth, with malice aforethought, express or implied. The distinguishing feature and criterion of murder so enumerated and defined is *malice aforethought*. Murder, therefore, at common law, embraces cases where no intent to kill existed, but where the state or frame of mind termed *malice* in its legal sense prevailed.

" By the Act of 31st March 1860 of our legislature, however, it is declared that ' all murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate, any arson, rape, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree.'

" The *intention to kill*, in all of the very many cases which have been decided under this clause of the statute, has been universally held to be the very gist and essence of the offence. If that intention is wanting, therefore, there can be no conviction of murder of the first degree. All murder, therefore, which is not of the first degree, as suggested and defined by the statute, is *necessarily* of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty, and fatally bent on mischief; but where no *intention to kill* exists, or can be reasonably and fully inferred. Therefore, in all cases of murder, if no *intention to kill* can be

inferred or collected from all the evidence in, and circumstances surrounding the case, the verdict must be murder of the second— or it may be even of a lower degree.　Manslaughter is defined to be the unlawful killing of another without malice, express or implied; which may be voluntarily, in a sudden heat, or involuntarily, but in the commission of an unlawful act.　Voluntary manslaughter often so nearly approaches murder that it is necessary to distinguish it clearly.　The difference is this: manslaughter is never attended by legal malice or depravity of heart—that condition or frame of mind before spoken of, exhibiting wickedness of disposition and recklessness of consequence or ' cruelty.　Being sometimes a wilful act (as the term voluntary denotes) it is necessary that the circumstances should take away every evidence of cool depravity of heart or wanton cruelty.　Therefore, to reduce an intentional blow, stroke or wounding, resulting in death, to voluntary manslaughter, there must be sufficient cause of provocation, and a state of rage or passion, without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed.　If any of these be wanting—if there be provocation without passion, or passion without a sufficient provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

" Insulting or scandalous words are not sufficient cause of provocation, nor are actual indignities to the person of a light and trivial kind.　Whenever the act evidences a deadly revenge, and not the mere heat of blood; whenever it is the result of a devilish disposition, and not merely the phrenzy of rage, it is not manslaughter, but murder.

" Having thus stated the law of the crime, and noted the distinction between the different grades of felonious homicide, let us very briefly and as clearly as we can, suggest the law of the evidence having application in cases such as you are here and now called upon to determine.

" And first it may be stated as a general rule, that all homicide is presumed to be malicious, that is, murder of some degree, until the contrary appears in evidence.　Therefore, the burden of reducing the crime from murder to manslaughter, where it is proved that the prisoner committed the deed, lies upon him.　He must show all the circumstances of alleviation or excuse upon which he relies to reduce his offence from murder to the milder degrees and kinds of homicide, unless, indeed, where the facts already in evidence show it.　So, too, as in this case, where the prisoner claims not a lower degree of homicide only, but an absolute acquittal, he must show all the circumstances by way of excuse upon which he relies to bring about such a verdict, and the burthen of satisfying you that he is entitled to such a verdict, rests upon him; where, as

[Meyers *v.* Commonwealth.]

in this case, the killing, and the killing by the prisoner, are equally and both alike admitted.

"Let us, however, not be misunderstood. Although the homicide, without the circumstances of alleviation or excuse, is presumed to be murder, it is not presumed to be murder of the first degree. The presumption against him rises no higher than murder of the second degree, until it is shown by the Commonwealth to be murder in the first degree.

"When death ensues, as in this case, from the use of a deadly weapon, the jury must scan closely the conduct of both parties, their former relations and behavior, and the current of events as they transpired; the character of the weapon, the manner of its use, and all of the circumstances attending it; and by a careful survey of all the evidence, and a conscientious judgment and appreciation of all the facts and circumstances disclosed by the testimony, endeavor to arrive at the true motive and cause which prompted the fatal blow. In coming to a conclusion in this regard, you will take into consideration each and every of the circumstances connected with, surrounding and having bearing upon the homicide, and in any way tending to shed light upon its perpetration.

"But it is claimed that the prisoner at the bar should be acquitted by reason of *insanity* at the time of the perpetration of the act; that, by reason of previous habits of dissipation long indulged in, and further, in consequence of poison taken by him some days before, and from the effects of which he had not fully recovered, his reason was dethroned, his judgment gone; that he had no control of his will and of his actions at the time, and so was wholly unconscious of this or any other act done by him; in a word, to put it in plainer phrase, he was not accountable for anything done by him at the time the homicide was committed.

"What then is 'insanity,' and more especially that which in the judgment of the law is a sufficient defence to shield this prisoner from the effects and consequences of his crime? Let us inquire; and to this inquiry, so vital to the prisoner and so pregnant with results, I beg your especial attention and most careful and conscientious observation and judgment.

"*Insanity*—*in*, not—and sound—sound or sane—is the lack of, or the opposite of, sanity; or, as technically and philologically defined, 'the state of being unsound in mind, derangement of intellect, madness. *Insanity* is chiefly used, and the word is applicable to any degree of mental derangement, from slight delirium or wandering, to distraction.' One so conditioned mentally at the time of the commission of a crime, is held in law, as he is in morals, irresponsible, and can no more be convicted and punished for his offence than the child of tenderest years, or the lunatic confined by the walls of an asylum. The justice and humanity of this proposition are obvious. Applied practically to the case upon

[Meyers *v.* Commonwealth.]

trial—if the prisoner at the bar, at the time of the perpetration of this admitted homicide, was insane, or so deficient in mental capacity as to be unable to form an intent to take life, he cannot be found guilty of murder of the first degree, or indeed of any offence under this indictment, and is entitled to an acquittal at your hands, by reason of such insanity or mental weakness.

" At the threshold of these instructions, upon this branch of the case, it is proper that I should say, as I do, and then to call your especial attention to the remark, that though the law in its charity very properly always presumes men innocent until they are proved guilty; yet it is also a presumption, essential to the safety of society as well as founded in experience, that every person is of sound mind until the contrary appears from the evidence; and the unsoundness of mind must be established by the defendant satisfactorily to the jury.    The burden is upon him to establish this fact.

" The law of this state is that, where the killing is admitted, as in this case, and insanity or want of legal responsibility is alleged as an excuse, it is the duty of the defendant to satisfy the jury that insanity actually existed at the time of the act, and a doubt as to such insanity will not justify the jury in acquitting upon that ground.

" The law presumes sanity when an act is done, if no insanity is shown by the evidence; and when it appears a man was sane shortly preceding the act and shortly after, the presumption of sanity exists at the time of the act, and no jury have a right to assume otherwise, unless the evidence in the cause and the evidence in connection with the act fairly convinces them that the defendant was actually insane at the moment the act was committed.

" And here let me enumerate briefly, as I do, the circumstances upon which the Commonwealth relied to convict.    It is claimed by the Commonwealth that this man, from the time that he got out of the workhouse until the evening of the perpetration of this terrible act, was sane; that his every conduct evidenced entire sanity; that he transacted his daily business.    It is claimed further, as I gathered it as I listened to the argument of the learned district attorney, as I was preparing these instructions, that upon the Saturday previous the defendant was attending to his business as usual; he had mind to send for a barber to come and shave him by the man he afterwards killed; that the barber came on the Tuesday following and shaved him; that he directed the barber to shave his barkeeper; that upon the afternoon of that day he sat down with the girl ' Jennie' to play a game of casino; that he was sufficiently himself—sufficiently up in his game to play his cards successfully, and to accomplish her defeat; and to join her in taking a drink; and this, too, a short time previous to the killing; that he had sense enough, in order to perpetrate this offence, to put the poker into the hole of the stove, to heat it by the fire to a ' white heat,'

[Meyers *v.* Commonwealth.]

and to thrust it into the groin or person of the deceased; that he was sane enough when called upon by the officers, in the first place, to demand a warrant, and then to declare that he would not go unless he was taken and carried, and then to declare that he would not go at all; and to declare that he would shoot the 'son of a bitch' that would arrest him; and then when brought to his notice that he must go—previously being in his stocking feet—he had sense enough to put on his slippers and go, &c. From all these circumstances it is insisted that the defendant was sane at the time of the perpetration of the act. To this the defendant answers, through the mouth of his witnesses, and it is urged upon you with great zeal and ability by his accomplished counsel, that he had, prior to this thing, been drinking to excess; that for months before that, from the time that he separated from his wife, he had given himself up to bad habits; that from the time he came out of the workhouse he was drinking to excess; that some two or three days previously he had taken poison, and from the effects of this and the drinks he had taken afterwards, he had not recovered; and that he was not in a condition to know what he was doing at the time. And as further evidence in that regard, they put these girls upon the stand, not as experts, but as giving their views of his mental condition. They call men who were in the cell with him, and they call other men to testify to his conduct and his manner; from all of which they ask you to infer that at the time of the perpetration of the act this man was insane. As to his conduct in the cell, it will be for you to say whether it was simulated or whether it was real. It will be remembered by you that Leigh detailed his conduct in the cell to you, how he sat down and told him about his troubles; the story about how he was committed, and cried about it. [These things will all enter into your deliberations in making up your minds as to his sanity, bearing in mind that the killing by the prisoner being admitted, the duty devolves upon him to clear himself of the killing, *to satisfy you beyond a reasonable doubt that he was insane at the time the act was committed.*] And in deciding upon this case, or upon any material part of it, such as the alleged insanity of the prisoner—which is the most material part of it—it is your duty to give the prisoner the benefit of any reasonable doubt arising out of the evidence which might prevent you from coming to a satisfactory conclusion. But this doubt—I call your attention to this—must fairly arise out of the evidence, and not be merely conjured up as a figment of the imagination. Jurors greatly mistake their duty when they go in search of a doubt outside of the evidence in the case. They have no right to raise a mere fanciful or ingenious doubt, to escape the consequences of an unpleasant or painful verdict. It must be an honest, it must be a conscientious doubt; such a doubt as would cause an ordinary, prudent man to hesitate; such a doubt as would

[Meyers v. Commonwealth.]

fairly strike a conscientious mind and cloud the judgment. When the law supposes a reasonable doubt, it does not mean that you are to speculate as to whether a matter is established by the evidence to your satisfaction, and might not have been otherwise; it means that you are to take nothing for granted upon mere assertion; and it means further, that when you honestly hesitate upon a question whether certain evidence establishes certain propositions when at the truth, and cannot come to a satisfactory conclusion as to the existence of a certain fact or not, as to its effect, then the doubt belongs to the prisoner at the bar. The difficulty, the reasonable doubt, as we have said, must be suggested by the cause itself, by the evidence incident to it, and not by the imagination of the jury. If the beam waver, then the doubt is thrown into the defendant's scale; but the jury must not so hold the beam as to cause it to tremble either in favor of the Commonwealth or of the defendant.

"[Returning again to this defendant's insanity, I again, and in one word, remind you, and impress upon you what I have already said, that where, as in this case, the killing by the prisoner is admitted, and insanity is alleged by way of defence, it is his duty to satisfy you, and the labor is upon him to convince you, that insanity, madness, actually existed at the time of the commission of the crime; and a doubt as to such insanity will not justify you in acquitting the prisoner upon that ground. If he has so satisfied you, if he has so convinced you beyond a reasonable doubt, such doubt being of the kind and of the character we have already discussed and defined to you, then the prisoner is not responsible for anything that he might have done] and is entitled to a verdict of acquittal at your hands; but if, upon the other hand, he has not so convinced you and satisfied you, he should be convicted in such form, and in such degree as you, in the exercise of your best judgment and most conscientious deliberation, think just and right under all the evidence which has been submitted to you. With the consequences of your verdict you have nothing to do. Those who take up the sword, as we have it upon high authority, must perish by the sword, and he who sows the wind need not be surprised if he should reap the whirlwind. The defendant, and not the Commonwealth, has made the bed upon which he lies to-day; and if the bed is so short that he cannot stretch himself, or if it is so long he cannot cover it, it is the fault of the prisoner, and not of the Commonwealth. Should you be of the opinion that the man is not insane, that he was sane at the time of the perpetration of the act; but if you should be of opinion that he had no intent to kill, which is the essence, which is the very heart of murder, if he was not guilty of wilful, deliberate, and premeditated killing, and still sane, then you can find him guily of murder in the second degree, if you think it right under the evidence. Or still lower—if you think the evidence does not warrant that you can find him guilty ·

[Meyers *v.* Commonwealth.]

of voluntary manslaughter, giving to the prisoner, as I have already said, the benefit of every reasonable doubt. As, for example, if you have a reasonable doubt that he had an intention to kill; that his conduct did not evidence wilfulness, deliberation, and premeditation, then you should find him guilty of murder in the second degree. If, coming still further down, you find his conduct did not indicate such a degree of crime, and you have a reasonable doubt about it, then you should find him guilty of voluntary manslaughter ; and [if, as I have already stated, you find him wholly irresponsible, *if he has satisfied you beyond a reasonable doubt*, a conscientious doubt arising out of the case, that he had no moral sense, that he was, in plain phrase, a madman at the time of the perpetration of the offence, then he should be acquitted of all crime, and you should so note the fact, and acquit him upon the ground of insanity]."

The jury, after they had retired, asked for further instructions as to what constituted a reasonable doubt, and the court repeated that portion of the foregoing charge in relation thereto.

The jury found the prisoner guilty of murder in the first degree.

The defendant moved for a new trial, which was overruled and sentence of death was pronounced upon the prisoner.

The defendant then took this writ, and among the errors assigned were : 1. The whole charge of the court as above. 2. Especially the particular portions of the charge included in brackets. 3. That under the evidence in the case the defendant was not guilty of murder in the first degree.

*John Coyle* and *William Reardon*, for plaintiff in error.—The main question raised by the specifications of error is what *amount* of evidence is required to establish the defence of insanity in Pennsylvania. We respectfully submit that this question is well settled in this state.

In the case of the Commonwealth *v.* Ortwein, 26 P. F. Smith 420, Stowe, J., affirmed by this court, says, "The law presumes sanity, but this presumption may be shaken or absolutely destroyed in some cases by the acts connected with and accompanying the commission of a crime. But before you acquit upon such ground, the evidence, whether arising out of such circumstances or from independent circumstances, must be sufficient to do more than merely raise a doubt as to the prisoner's insanity. It must be sufficient fairly and reasonably to satisfy you of the fact of such insanity. The law does not require proof to an extent to preclude a reasonable doubt of such insanity, but it should be such as to satisfy you from the *preponderance* of testimony that the prisoner was insane at the time of the killing. See also, Lynch *v.* The Commonwealth, 27 P. F. Smith 205 ; Brown *v.* The Commonwealth, 28 Id. 122.

If then the doctrine in Pennsylvania be, as we insist it is, that a

[Mcyers v. Commonwealth.]

defendant who relies upon the defence of insanity must prove it by the *preponderance* of testimony, the court below, in this case was certainly in error when they instructed the jury substantially, that where the defendant relies upon the defence of insanity, he must produce evidence to satisfy and convince the jury to an extent to preclude or shut out a reasonable doubt of his sanity; in other words, he must satisfy a jury beyond a reasonable doubt that he is insane.

The following cases also sustain the same doctrine laid down in the case of Ortwein v. Commonwealth, *supra;* Commonwealth v. Eddy, 7 Gray 583; Loeffner v. The State, 10 Ohio St. 598; People v. McCann, 16 New York 58; Commonwealth v. Mosler, 4 Barr 264.

And we contend that under all the evidence in the case (even admitting that there was not sufficient proof of the defendant's insanity), that the defendant was not guilty of murder in the first degree, as there was an entire absence of motive or intent to take life.

*E. A. Montooth,* District Attorney, for the Commonwealth, contended that the prisoner was of sound mind, and elaborately presented the views referred to by the court below in their charge when narrating the circumstances upon which the Commonwealth relied for conviction.

Chief Justice AGNEW delivered the opinion of the court, January 2d 1877.

There is one error for which the sentence in this case must be reversed. It appears in several parts of the charge, leaving no doubt as to the meaning of the learned judge who presided at the trial. It must, therefore, have impressed the minds of the jurors. Without specifying each instance, it may be summed up in a single statement, that the judge instructed the jury, that they must be satisfied *beyond a reasonable doubt,* that the prisoner was insane at the time the act was committed. This statement is too stringent and throws the prisoner upon a degree of proof beyond the legal measure of his defence. That measure is simply proof which is satisfactory—such as flows fairly from a preponderance of the evidence. It need not be beyond doubt. A reasonable doubt of the fact of insanity, on the other hand, is not sufficient to acquit upon a defence of insanity. This has been held in several cases: Ortwein v. Commonwealth, 26 P. F. Smith 414; Lynch v. Commonwealth, 27 Id. 205; Brown v. Commonwealth, 28 Id. 122. Sanity being the normal condition of men, and insanity a defence set up to an act which otherwise would be a crime, the burthen rests upon the prisoner of proving his abnormal condition. But the evidence of this need be only satisfactory—and the conclusion such as fairly results from the evidence. Where the evidence raises a balancing question, and the mind is brought to determine its preponderance, there may be a doubt still existing in the mind, yet the actual

[Meyers *v.* Commonwealth.]

weight may be with the prisoner; and this proof should be considered satisfactory. In cases of conflicting evidence the preponderance must govern, there being no other rational means of decision. But if we say in such a case it must be satisfactory *beyond* a reasonable doubt, it is evident the expression implies more than a mere preponderance. It is difficult to define the precise difference between the two measures, yet we are conscious in our own minds that to be convinced beyond a reasonable doubt is a severer test of belief than to be satisfied that the preponderance falls on that side. Probably the true reason of the difficulty in defining the difference lies in the inability to define a reasonable doubt. A reasonable doubt must be an honest and conscientious difficulty in believing, one not merely subtle or ingenious—it must arise out of the evidence, and not be fanciful, or be conjured up to escape consequences. It must strike the mind with such force as to compel it to pause in yielding belief. These are characteristics, but do not define the measure of belief, which is beyond a reasonable doubt. The judge stated well all these characteristics, and yet in conclusion said, by way of illustration of his meaning, "If the beam waver, then the doubt is thrown into the defendant's scale; but the jury must not so hold the beam as to cause it to tremble either in favor of the Commonwealth or the defendant." Now, if we apply this illustration of the reasonable doubt which operates to acquit a prisoner, to the evidence of his insanity, and say that his proof of the fact shall be beyond a reasonable doubt, and if the beam wavers, it is to be found against his defence, we discover that it implies a higher degree of proof to establish the defence of insanity than the law warrants. It must be not only satisfactory, but be satisfactory beyond a reasonable doubt. The beam must not waver when preponderating to the defendant's scale, but it must go down quickly. It seems to us, therefore, that this expression, so often repeated to the jury, must have impressed them with a belief that a high measure of proof of the insanity of the prisoner was required. The distinction may appear nice, yet we must not overlook the effect of language upon common minds, when the stake is life. Justice cannot suffer it to be imperilled beyond a just measure of belief in those who are the triers. Common minds do not analyze accurately the degrees of belief, or the nature of the doubts which affect it. We think, therefore, there was error in stating the degree of belief in regard to the defence of insanity too strongly. .

This conclusion renders it unnecessary to decide the question whether "the ingredients necessary to constitute murder in the first degree were proved to exist." We would avoid the inquiry in this case, because it raises a new and difficult question under the Act of 1870, commonly called the Schoeppe Act; that is to say, how far a doubt in the mind of this court of the existence of an intention to kill will be a ground of reversal. We have held, in

[Meyers v. Commonwealth.]

the case of Grant v. Commonwealth, 21 P. F. Smith 495, that when the ingredients of murder in the first degree are proved to exist, the power of this court to grant a new trial ceases. But there may be cases—and perhaps this is one of them—where the facts, from which the intention to kill (the principal ingredient in murder of the first degree) may be inferred, are so doubtful that different views of their operation may be taken. Where a jury, who hear the witnesses and observe their conduct, take the darker view, and believe the intent to kill existed, and in this view are sustained by the court below, it is a nice question how far our views of the evidence should prevail to grant a new trial.

We abstain from indicating any opinion on this question; yet it is not amiss to suggest, as there must be a new trial, that a careful inquiry should be made how far the facts disclose any intent to take life. The intent to do grievous bodily harm was clear, and the prisoner's frame of mind was undoubtedly malicious, and hence the case was one of murder. But whether the prisoner intended to take the life of the deceased is not so clear. The place at which he aimed the heated poker, viz., the groin, and not at a vital organ, and the direction the poker would have taken, to wit, downwards, instead of into the abdomen, had not the end of the poker been bent, and the entire conduct and demeanor of the prisoner before and after the occurrence, altogether are circumstances which may not convince the mind of an actual intention to take life, while they lead to a conclusive belief of an intent to do great bodily harm.

But, for the error heretofore stated, the sentence is reversed, and a *venire facias de novo* awarded.

PAXSON, J.—I would reverse this judgment upon the ground of the inadequacy of the charge. I hold it to be the duty of a judge trying a man for his life to charge fully upon the law as applicable to the facts. And this without regard to the points presented by counsel. The rule that a judge is not to be convicted of error for what he omits to say, unless his attention is called to the subject by a point or request to charge, is well enough in civil cases, but ought not, in my judgment, to be applied to a capital case. The prisoner has a right to have the jury properly instructed upon every question of law legitimately raised by the evidence. This right he cannot waive, nor can his counsel do so for him. In this case the charge was wholly inadequate. This was probably owing to the fact that the prisoner's counsel mistook their line of defence. They relied to a great extent upon the ground of insanity. Upon this point there was no evidence worth submitting to the jury. There was nothing to show that general insanity which dethrones reason and relieves from legal and moral responsibility. But there was abundant evidence of that condition of partial insanity produced by

[Meyers *v.* Commonwealth.]

excessive drinking, which, while it is no excuse for crime, is never-
theless sufficient to prevent the formation in the mind of that delibe-
rate intent to kill, which is of the essence of murder of the first
degree.   In other words, the defence was insanity instead of intoxi-
cation.   Of the former there was no evidence : of the latter there
was abundant.   The points put by the prisoner's counsel referred
to insanity, and the learned judge charged elaborately upon this
branch of the case.   His rulings, whether correct or otherwise, had·
no application to the facts.   The defence set up having utterly failed,
I am not surprised that the jury convicted of the capital offence.   Had
the law, as applicable to intoxication, been properly submitted to
them, it is possible they would have convicted the prisoner only of
murder of the second degree.   It is not necessary to elaborate.   I
concur cheerfully in the judgment.