# Commonwealth *v.* Bober, Appellant.

*Evidence—Form of question to witness—Explanatory answer—Motion to strike out testimony.*

1. Where a question is put to a witness which cannot be answered as put, without including in the answer a statement of a fact as explanation, complaint cannot be made that the witness added the necessary explanation or qualification.

2. A motion to strike out an entire answer of the witness is properly overruled where it appears that material portions of the answer were proper and legitimate.

*Criminal law—Assault—Evidence—Weapons.*

3. On the trial of an indictment for assault and battery where a policeman called as a witness produces certain weapons and states that they were handed to him by another officer when the defendant was arrested and the victim of the assault was lying a few feet distant, such weapons are properly admitted in evidence if it appeared that

there was fresh blood on one of them, that they corresponded with the weapons which a witness described as having been used, and that the appearance of the wounds inflicted indicated that such weapons had been used.

*Appeals—Assignments of error—Evidence.*

4. Assignments of error to the admission of evidence which do not quote the answers of the witnesses to the questions propounded will not be considered.

*Criminal law—Evidence—Assault and battery—Participation in strike.*

5. Where on the trial of indictment for assault and battery committed during a strike, a witness for the defense is asked on cross-examination whether he had been arrested during the strike, and he answered that he had been, and objection is made that the question was irrelevant and not proper cross-examination, the court cannot be convicted of reversible error in overruling the objection, and especially so if it appears that the error, if any, was rendered harmless by the subsequent statement of the witness admitted without objection, and not contradicted, that he was duly tried and acquitted of the charge.

*Trial—Improper remarks by the trial judge—Withdrawal of juror—Review—Practice, C. P.*

6. Where a trial judge makes remarks to the jury in ruling upon questions of evidence, and such remarks are claimed to be improper, the proper practice is to except to the remarks as a basis of assignments of error on appeal, and not to move to withdraw a juror and continue the case.

*Criminal law—Improper remarks of counsel for defendant—Comment by the court.*

7. A trial judge in a criminal case cannot be charged with error in adversely commenting upon a statement made by counsel for the defendant to the effect that if a certain person had been produced as a witness, he would have given certain testimony.

*Criminal law—Alleged improper remark of the court—Trial judge.*

8. On the trial of three persons for assault and battery the trial judge cannot be convicted of error in stating to the jury that the defendants were indicted before the jury "for aggravated assault and battery and other crimes," where it appears that the indictment contained three counts charging other offenses than the one mentioned.

9. In such a case the court cannot be charged with error in saying to the jury "the doctrine of reasonable doubt is the one which is usually relied on for clearing anybody, however obviously guilty. Why? Because it leads to confusion of thought and terms. Reasonable doubt

means if you examine all the circumstances of the case and weigh all the evidence, and are then satisfied that that man did it, and that man helped him, then you have no reasonable doubt."

*Criminal law—Assault and battery—Strikes—Labor unions—Improper charge.*

10. A conviction for assault and battery committed during a strike will be set aside where it appears that the trial judge in commenting upon the credibility of the witnesses for the defendants called to prove an alibi, assumes as a fact, what had not been proven by the evidence, that an agreement existed among the strikers to prevent others from working by intimidation and violence, and that this unlawful mode of making the strike effective was in accord with the general rules, principles or laws of the labor union which had ordered it.

Argued Nov. 30, 1914. Appeals, Nos. 151 and 152, Oct. T., 1914, by defendants, from judgment of Q. S. Phila. Co., Dec. T., 1913, No. 227, on verdict of guilty in case of Commonwealth v. Joseph Bober and Charles Schwartz. Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ. Reversed.

Indictment for assault and battery, aggravated assault and battery and assault and battery with intent to kill. Before SULZBERGER, P. J.

At the trial it appeared that the defendants were charged with' assaulting William Rice on December 7, 1913, at a time when the garment makers of Philadelphia were on a strike. Bober and Schwartz were strikers and Rice was employed as a designer in the trade, but was not a striker.

When James B. Stevenson, a witness for the prosecution, was on the stand, he testified as follows:

"A. I was standing at the southwest corner of Thirty-first and Lehigh, waiting for a car. I had just missed a car, and there were no cars coming west on Lehigh, and naturally none were coming east. While standing there I looked west on Lehigh avenue, on the south side of the street, and noticed four men coming abreast. These four men came walking down the street. As they

stood at the corner they walked up to a small boy I had been talking to on the corner. They started to talk to this boy, about eighteen or nineteen years old, in Jewish. The boy immediately left them and started on a fast walk, then he started to run, turning south on Napa street, which is the first street west of Thirty-first. Then these four men that are in the case started south on the west side of Thirty-first street. When about 100 feet below Thirty-first and Lehigh I heard a shout. As I was crossing the street to go on the way to work I heard a shout. I turned around and noticed these four men, that went south on the west side of Thirty-first street, chasing a man. They crossed over on the east side of the street and attacked this man. They had blackjacks and other weapons."

On cross-examination the witness was asked this question:

"Q. Do you know who the boy was that you describe as eighteen or nineteen years old? A. I do not know the boy's name. He was a small boy about eighteen or nineteen years of age. Q. He had nothing to do with this fight? A. No, sir. He was a picket or lookout. He did not commit the assault."

Mr. Gray: I move the statement be stricken out as not responsive to my question.

The Court: Unless you strike out the question I will not strike out the answer.

Exception noted for defendants. Bill sealed. [1]

The Court: The question was an improper one, propounded for no valid reason, and was not proper cross-examination. It was intended to introduce, if anything, confusion into the case, and as it started the witness to thinking about the case in a manner that had nothing to do with the case, and evidently for a purpose that was not intended to foster the proper trial of the case, it is not astonishing that the witness should conceive it to be something of the same style as the counsel conceive it, and his answer is quite as good as the

question.   Unless the question is stricken out I will not strike out the answer.

Defendants except to the remarks of the court.   Bill sealed. [2]

When Benjamin Karp was on the stand, the court asked him this question:

"Q. What was the committee on, murder or assault and battery?"

Mr. Gray: I object to your honor's remark and ask an exception to it, and ask for the withdrawal of a juror.

The Court: I refuse it and give you an exception.

Exception noted for defendants. [6]

"Q. You have been following up strikes for several years back?"

Objected to as immaterial and irrelevant and not cross-examination.

The Court: If they organized a force, and of course it is idle to contend that there was not an organized force here, to assault this man, these people profess to know all about the force.   Let them tell all they know.

Mr. Gray: I ask an exception to your honor's remarks, and move for the withdrawal of a juror.

Motion overruled.   Exception noted for defendants. [7]

The district attorney asked Karp this question:

"Q. Were you not arrested for violence and convicted and sentenced for violence used upon workmen during the strike in 1911?"

Objected to.   Objection overruled.   Exception noted for defendants. [8]

"Q. But you were arrested during this strike?   A. One time, yes; sir."

Objection overruled.   Exception noted for defendants. [9]

Counsel proceeded with their addresses to the jury, when:

The Court (addressing counsel for defendant): You have no right to comment upon the absence of a wit-

578    COMMONWEALTH *v.* BOBER, Appellant.

Statement of Facts—Charge of Court below.    [59 Pa. Superior Ct.

ness by supplying imaginary testimony and asking a conclusion from it.

Mr. Gray: I ask your honor to say I have not supplied any absent testimony.

The Court: You have. You have said what a man would swear to. You said if a man was here he would swear that was not the man.

Mr. Gray: I have a right to ask the jury to draw that inference.

The Court: You have a right to ask it, and I have a right to comment upon it.

Mr. Gray: I ask an exception to your honor's comment.

Exception noted for defendants. [10]

The court charged as follows:

Gentlemen of the jury,—[Bober, Schwartz and Portner are indicted before you for aggravated assault and battery and other crimes.] [11]    I have already intimated that with regard to Benjamin Portner, whether he was or was not present makes no difference. The evidence is not such as would warrant a jury to convict, and you may therefore discharge Portner's case from your minds. You have therefore to try Bober and Schwartz, and the case is one of more than ordinary importance.

On the morning of November 7, 1913, a citizen of Pennsylvania, entitled to the protection of the commonwealth and in the peace of the commonwealth, is grievously assaulted near his home by four men with four weapons. [You see the weapons, a brick in a stocking, this club of wood set with iron, and the evidence concerning which is that it was covered with fresh blood, and these two blackjacks. The men who did the deed dropped the evidence, as they fled, upon the ground, and there it was found, four men, four murderous weapons and four wounds.] [12]    The peculiarity of the case is that there is not a word of evidence that the men who assaulted Rice had any personal feeling against him,

or had any enmity against him, or had any cause of personal quarrel. The cause of personal quarrel they had was not so much with Rice as with the state of Pennsylvania. [The commonwealth of Pennsylvania, following out a long, deliberate, statesmanlike policy, has declared that strikes for the betterment of the conditions of laborers are lawful, that men who are employed in a factory or in several factories may meet together and agree that they will not work unless they get certain improvements in terms, and that coming together is no longer as it was under the common law, a conspiracy. It is a harmless and lawful thing to do. Men have a right to strike, and have a right to refuse to work, but they have only a right to one kind of a strike. They cannot strike an individual with those pieces of murderous iron. That they cannot do lawfully. Individually the four men who did that and had those weapons, if they were sane men, would not have assaulted Rice. They had nothing against Rice, except that he refused to obey the order of the union that he should not work. It was not any original personal impulse, but it was the impulse of an organization which set itself up and declared a law superior to the commonwealth of Pennsylvania, namely, while the commonwealth says you may not use violence, these men, who had no personal interest, did use violence, and it is a fair presumption that they did so because they felt that the interest of the organization to which they were attached, would be more quickly and more effectively served by violence than by non-violence.] [13]

[The importance of that consideration is this: If men can be found to violate a law in the interest of an organization that holds itself up in any of its parts (I do not care whether it is a secret committee of one, two or three, to arrange for these cases), it is just as easy for that organization to arrange alibis and perjuries as to arrange assaults.] [14] [The law that prohibits murder is just as sacred as the law that forbids

perjury, and when men can be found who set them-
selves up as doing a right and lawful thing when they
commit the initial stages of a murder, they will not
scruple at a little perjury. You need not be nervous
about that.] [15] [As we are talking about alibis, I
may as well tell you that an alibi is the best defense
possible, because it makes guilt impossible for the de-
fendant. That is the reason it is the most time-
honored defense where there is no other defense. That
is the reason it is the most discredited defense in the
whole history of the criminal law, and in every case it
must be scrutinized with abundant care.] [16]

Now, what happened? On the morning of Novem-
ber 7, four persons, who have no friendship for Rice and
no enmity for the defendants, saw those two defendants,
Schwartz and Bober, at a place miles from their homes,
early in the morning, and one of them, Bober, says
that though his business took him down town and he
lives down town, and it took him down town early in
the morning, yet he spent the night up town with a
man named Berman, also associated with him in this
matter, and that they went out together and went to
this place. Berman, who is the host on this occasion
of this down town gentleman, tells you a story about
where he went. He is familiar with some things, but
not so familiar with the topography of Philadelphia
as he ought to be. When he tells you that he went
from Thirty-first and Montgomery avenue up in a
practicable route to 3917 Ridge avenue in ten minutes,
he tells you that which is physically impossible by
distance, unless you could gather from his looks that
he could do a mile and two-fifths, or thereabouts, in
ten minutes. If he could do that, then his story is
true. You know the probabilities. [This man Bober,
miles from his home, a little after seven o'clock in the
morning, is identified by four people,] [17] and so is
Schwartz, who saw them out of their neighborhood for
what purpose? [Somebody was arranging to attack

Rice.  Somebody was arranging to carry these things, and who would they be but the people in interest, and here are all these people in interest, the alibi people and all, including the host Berman.  When you see people in interest doing a thing calculated to promote that interest, you need not go hunting in crevices for non-existing people who have no interest.  You do not suppose that any four people who had no interest would risk the possession even and the use on the highway of those murderous weapons if they had nothing against the man, and I have no doubt that those two people had nothing against the man except that he violated a law which they held to be superior to the law of Pennsylvania, that guarantees him the right to work if he wants to, and guarantees him the right to be immune against their physical violence.  Somebody must have held the law of Pennsylvania to be dirt beneath his feet as compared with the interest of the union.  Now the question is, are these the somebodies?]  [18]

You saw the witness Stevenson.  You saw the two women and the boy.  They have no interest.  They have no prejudice.  They have no partisanship.  The only thing that aroused a sense of partisanship in Stevenson was perhaps the unjust reflection upon the cowardice of four armed men attacking one unarmed man.  That Stevenson undoubtedly entertained.  He was full of loathing and contempt for four men that would do that job.  I suppose that is true, but that is the only feeling that has been manifested in the case.  One woman had nothing but the ordinary merciful feeling of a woman for a party in distress, and ran over to see whether she could help a man who she thought for the moment, was choking and dying.  This was not an ordinary occasion.  This was the only man who was murderously assaulted in that square at that time, and it is not an habitual thing for people to do, so that when people see the men who are connected with it they are very apt to get a good look and a deep impression.  It

is not like the casual passer-by. You could pass that man on Chestnut street a hundred times and not notice him, but if you saw him connected with a murderous assault the influence of a fair feeling of humanity and citizenship would arise within you, you would say that the man who does that ought to be punished, and then your look would be something more than a casual glance. The impression would be something deeper than a feeling when you have to ask yourselves the question if those people were there.

[The alibi is sworn to only by their own crowd. Everything is made convenient. The leader of the alibi evidence is Berman, who was the host of the occasion, the man who walked from Thirty-first and Lehigh avenue to Twenty-ninth and Lehigh avenue, and up Twenty-ninth to Allegheny avenue, and from Twenty-ninth and Allegheny avenue to Ridge road and Allegheny avenue, and out north to Laurel hill near Dobson's Mills, and did that in ten minutes. His testimony will bear scrutiny.] [19] If his testimony will bear scrutiny it is right of a piece with all the other witnesses on that subject. Whenever a thing fits so well it will bear scrutiny. You have therefore two men here identified with a murderous assault by four witnesses without known bias or prejudice, except the truth and the interest of the commonwealth. You have these two men out of place, miles from their habitation, at an early hour in the morning, and simultaneously this deadly assault and these weapons. It is for you to form a reasonable conclusion.

[The doctrine of reasonable doubt is the one which is usually relied on for clearing anybody, however obviously guilty. Why? Because it leads to confusion of thought and terms.] [20] Reasonable doubt means if you examine all the circumstances of the case, and weigh all the evidence, and are then satisfied that that man did it and that that man helped him, then you have no reasonable doubt. If you are not satisfied, for

instance, as with Portner, if you are not satisfied that
he was there and helped, then you have a reasonable
doubt. I ask you to acquit Portner because I have
a grave doubt, but if you are satisfied that they were
there, that all the circumstances indicate that they
did it, that Stevenson's testimony is true and that the
testimony of those women is true and the testimony
of that boy is true, then all these subtle discriminations
of this or that, or that one woman in her observation
thought she saw six instead of four, are things that you
must consider, but the mere fact that there are varia-
tions in accounts is nothing. [It is because of the non-
variation in accounts that we generally detect perjury.
For instance, there is no variation in the account of the
alibi. They are all there at 232 North Ninth street at
the right time. Whenever six people swear the same
way, in the same manner, every "i" dotted the same
way and every "t" crossed, then the presumption of
perjury is very near.] [21] Why? Because the power of
observation, the opportunity of observation, the mental
condition of observers, the position in which they stand,
the correctness of the impression, the clearness of the
memory, all these are variable in all individuals. It is
by the body and pith of statements, by the manner and
antecedents and interest of a witness, that you judge
the value of testimony, not by microscope to find out
small differences. It is the body of the testimony you
must consider. If you took the other as a norm, courts
of justice would be idle playgrounds for ultra ingenuity,
and places from which law and justice would be ex-
pelled. There is not a case and there never was a case
where you could not make all sorts of ingenious argu-
ments, which, tested by the solid ground of law, common
sense and good reason, as good as God has given it to
you, could not be attacked by quibbles. Dismiss from
your consideration anything but the body of the evi-
dence, the character of the witnesses, their opportunities
for observation, and your estimate of the value of what

they say.  That counts.  If you are then not satisfied that one or the other of these defendants was present and participated in that assault, you should acquit them, or acquit the one you think was not there, and convict the one that was.  But if you think one was there, or that both were there, it is your duty to convict.

[Mr. Gray: I ask that a juror be withdrawn because of the lack of impartiality in your honor's charge, which was practically a charge in favor of the commonwealth.

The Court: I will not sustain a motion like that. I will give you a general exception to the charge.  The reflection that this is a charge practically in favor of the commonwealth may, of course, be prompted by your ultra sensitive condition at this moment.  No fair man could say so.

Mr. Gray: Of course, your honor recognizes I make that request with all due respect to the court.

The Court: You have a general exception.  Better than that you cannot do.

Mr. Gray: Will your honor pass on my motion for the withdrawal of a juror?

The Court: It is refused.

Exception noted for defendants.] [22]

Mr. Gray: I ask your honor to instruct the jury to entirely disregard these weapons as there has been no proof with reference to them.

The Court: I refuse to do it.

Exception noted for defendants. [23]

[The Court: The weapons will go out with the jury, with the knowledge that that iron tipped wood was the one that was covered with blood.

Mr. Gray: I ask an exception to your honor permitting the weapons to go to the jury.

Exception noted for defendants.] [24]

Mr. Gray: I ask an exception to that portion of your honor's charge which referred to the piece of wood as tipped with iron and covered with blood.

Exception noted for defendants.

Verdict of guilty, upon which judgment of sentence was passed.

*Errors assigned* were (1, 2, 6–10) various rulings as above; (11–24) instructions as above. .

*William A. Gray*, for appellants, cited as to motion to withdraw juror: Com. v. Swartz, 37 Pa. Superior Ct. 507; Com. v. Williams, 41 Pa. Superior Ct. 326; Com. v. Martin, 47 Pa. Superior Ct. 346; Com. v. Weber, 167 Pa. 153.

Cited as to the partiality of the charge; Linn v. Com., 96 Pa. 285; Com. v. Pipes, 158 Pa. 25; Com. v. Penrose, 27 Pa. Superior Ct. 101; Com. v. Moll, 39 Pa. Superior Ct. .107; Com. v. Shoemaker, 240 Pa. 255.

Cited as to the alibi: Com. v. Gutshall, 22 Pa. Superior Ct. 269; Com. v. Andrews, 234 Pa. 597.

Cited as to reasonable doubt: Com. v. Devine, 18 Pa. Superior Ct. 431; Com. v. Rider, 29 Pa. Superior Ct. 621.

*John Monaghan*, assistant district attorney, with him *Samuel P. Rotan*, district attorney, for appellee, cited: Com. v. Karamarkovic, 218 Pa. 405; Com. v. D'Angelo, 29 Pa. Superior Ct. 378.

OPINION BY RICE, P. J., April 19, 1915:

A strike of the garment workers of Philadelphia was in progress. The two appellants and some of their witnesses were among the strikers and were members of the same labor union. William Rice was a designer in the trade and was not a striker. On the morning in question, while on his way to work, he was set upon and brutally and maliciously beaten by four men acting in concert and was grievously wounded. These appellants and Benjamin Portner were arrested and jointly indicted and tried for the crime. Portner was acquitted. The

other two defendants were found guilty and sentenced. They thereupon took these separate appeals which were argued together. It will aid in the understanding of the questions raised by the assignments of error, to state at the outset: First, there was ample testimony given by disinterested witnesses identifying these appellants as two of the four assailants; secondly, the defense did not consist in a denial of the assault or its aggravated nature, or in an assertion that it was provoked or was excusable or justifiable, but in a denial that these appellants participated in any way. The determination of the issue depended almost altogether on the credibility of the witnesses produced by the commonwealth and of the defendants and the witnesses produced by them. Notwithstanding the simple nature of the issue, twenty-four assignments of error have been presented for our consideration. As the case must go back for a new trial it seems necessary to discuss all of them.

An eyewitness testified in his direct examination to having seen and talked with a boy, with whom he had seen the four assailants talking immediately before the assault, near the place. On cross-examination he was asked this question: "He had nothing to do with this fight?" to which he answered, "No, sir. He was a picket or lookout. He did not commit the assault." The question was so worded as to call for his knowledge of the boy's connection with the fight, either as a principal or as an aider and abettor. If the boy was a picket or lookout, it could not be said that he had nothing to do with the fight. And, if the witnesses could not truthfully answer the question, as put, without including in his answer a statement of that fact, the counsel putting the question has no just cause to complain that the witness added the necessary qualification or explanation. Moreover, the motion to strike out was not confined to that portion of the answer, but included the entire answer, and clearly the first and last sentence of it were beyond legitimate objection or even criticism. The court

committed no error in overruling the motion and no reversible error in its statement of the reasons for doing so.

The second question as stated by appellant's counsel is: Whether certain weapons should have been permitted to go out with the jury, there being no identification of them, and they not having been offered in evidence. When the four weapons, a brick wrapped in a stocking, a heavy piece of wood tipped with iron and two blackjacks, were produced on the witness stand by officer Goff, a witness for the commonwealth, objection was made to their introduction, which the court overruled and noted an exception for the defendants. This ruling, considered in connection with the testimony given while the weapons were being exhibited to the jury, is fairly to be regarded as tantamount to formal admission of them in evidence at the instance of the commonwealth. Therefore, the above statement of the question is based, in part, on wrong premises. But the sufficiency and competency of the proof connecting them with the crime, as well as the propriety of the court's charge to the jury on that subject, are distinctly brought in question by assignments of error, and will be considered. Rice, the person assaulted, testified that one of the four assailants said: "Use your jacks, boys"; that they used jacks upon him; and that he received four serious wounds. Another witness testified that she saw four men jump at Rice and hit him; that they were hitting so fast she could not tell what they were hitting with; and that two blackjacks were lying on the ground when he was lying there (bleeding profusely from the wounds), which she picked up. Officer Stevenson testified that four men attacked Rice and used blackjacks or other weapons on him. According to the testimony of officer Goff these four weapons—the one tipped with iron being covered with fresh blood—were handed to him by another officer when they arrested Bober and when Rice, prostrated by the murderous assault, was lying a few feet distant. If the witness Goff had picked up these weap-

ons at that time and place there could be no doubt of their admissibility in evidence. Their connection with the crime would have been for the jury: Com. v. Karamarkovic, 218 Pa. 405. And although he did not pick them · up with his own hands, yet when the circumstances of the assault, the nature of the blows and wounds inflicted, the fact that there was fresh blood on one of the weapons, the correspondence of the weapons with those which the witness described as having been used and the close proximity of the time and place of the assault to the time and place of the weapons coming into possession of the officer are considered, we cannot say that there was not sufficient evidence to warrant the court in admitting them and sending them out with the jury. But the court's determination of the preliminary question was not conclusive of the identity of the weapons and their use by the assailants. As pointed out in the case cited, their connection with the crime was for the jury. Sufficient reference to the evidence has been made to show that it was not so clear, explicit and overwhelming—certainly not as to some of the weapons—as to support the virtually binding direction which the court gave regarding all of them in these words: "The men who did the deed dropped the evidence, as they fled, upon the ground, and there it was found, four men, four murderous weapons and four wounds."

The seventh and eighth assignments do not quote the answers of the witnesses to the questions, and therefore, so far. as they relate to the overruling of the objections they are not in accordance with our rule and are dismissed. The seventh assignment, so far as it relates to the remarks of the court, will be considered in another connection. It is not clear that the question put to the witness Karp (ninth assignment) was wholly irrelevant and improper cross-examination. The evident purpose was to ascertain how actively he had been engaged in the strike. At any rate, the error, if any, was

rendered harmless by his subsequent statement, which was admitted without objection and was not contradicted, that he was duly tried and acquitted of the charge.

There are several assignments based on exceptions to the court's refusal to withdraw a juror and continue the case, because of certain remarks made by the court in ruling upon questions of evidence, and because of the general nature of the charge. In support of these assignments counsel cites cases where the appellate courts have awarded new trials because of improper remarks of counsel. But the analogy is not perfect. Where exception is taken and allowed by the judge to his charge or to remarks made by him in the presence of the jury during the taking of evidence, the party supposing himself aggrieved has an ample remedy for correction of the supposed error. There is no occasion to resort to the circuitous method which must necessarily be resorted to in order to bring the remarks of counsel before the reviewing court; certainly there was no occasion for doing so in this case. The obvious objection to the course pursued is that it introduced into the trial regrettable asperities, and resulted in the unnecessary multiplication of exceptions and assignments of error. These assignments are dismissed.

The relevancy and propriety of the comment the court made during the argument of defendants' counsel to the jury, depended upon what the counsel had said. There is no way of determining what he said except by referring to the bill of exceptions. The latitude which counsel may take in arguing to the jury does not wholly depend on the correctness of his reasoning. But there is a wide difference between asking the jury to draw an inference unfavorable to the commonwealth from the nonproduction of a certain eyewitness to the assault (see Ginder v. Bachman, 8 Pa. Superior Ct. 405, and cases there cited) and positively asserting that if he had been produced, he would have given certain

testimony.    The former might be legitimate argument, if grounds were laid for it in the evidence, while the latter would not be.    It may be that the court misunderstood counsel, but for present purposes it must be assumed, as already said, that the bill of exceptions sets forth what counsel said.    This being so, we cannot say that the court's comment was irrelevant or improper.

The assignment of error to the court's remark at the outset of the charge, "Bober, Schwartz and Portner are indicted before you for aggravated assault and battery and other crimes" is without merit.    The indictment contained three counts.    It is evident to us, and must have been to the jury, that the court's reference to "other crimes" was to the crimes for which the defendants, to adopt the language of the court, "are indicted before you"; that is, in the indictment the jury had been sworn to try.

In charging upon the subject of reasonable doubt the court said: "The doctrine of reasonable doubt is the one which is usually relied on for clearing anybody, however obviously guilty.    Why?    Because it leads to confusion of thought and terms."    We fail to see anything wrong in the court's making this general statement, for it is notoriously true that the doctrine is often pressed beyond its legitimate scope, to the miscarriage of justice, because it readily lends itself to confusion of thought and terms.    It must be conceded, however, that if this had been all the court said upon the subject, it would have been inadequate, and for that reason misleading: Com. v. Andrews, 234 Pa. 597; Com. v. Duffy, 49 Pa. Superior Ct. 344.    The very caution implied in the remarks necessarily called for further instructions in order that the defendants might have the full legal benefit of the just and time-honored doctrine.    And we cannot say that the objection of inadequacy was removed by the court's subsequent statement: "Reasonable doubt means if you examine all the circumstances of the case, and weigh all the

evidence, and are then satisfied that that man did it and that that man helped him, then you have no reasonable doubt." However it may be in other jurisdictions, a distinction is made in this commonwealth between "satisfactory proof" and "proof beyond a reasonable doubt." The former is the measure of proof required to establish an alibi, and some other affirmative defenses, while the latter is the measure required for conviction. As pointed out in Meyers v. Com., 83 Pa. 131, "It is difficult to define the precise difference between the two measures, yet we are conscious in our minds that to be convinced beyond a reasonable doubt is a severer test of belief than to be satisfied that the preponderance falls on that side." Manifestly, therefore, instructing the jury in terms which might lead them to the belief that "satisfactory proof" and "proof beyond a reasonable doubt" are synonymous terms does not meet the full requirement of the law.

The remaining assignments of error will be considered as a connected whole, as they relate to the defense of alibi and to the consideration to be observed by the jury in weighing the testimony of the defendants' witnesses. Before doing so, however, we remark that the manner in which the court spoke of the witnesses (in the nineteenth and twenty-first assignments) was calculated to detract somewhat from the weight which the jury might have otherwise given to their testimony. After having told the jury that the defense is "the most discredited one in the whole history of the criminal law," it was at least fair to the defendants to say that some of the witnesses were not shown to have been strikers.

Coming then to the general subject above indicated, in the course of his charge to the jury the learned judge said: "The peculiarity of the case is that there is not a word of evidence that the men who assaulted Rice had any personal feeling against him, or had any enmity against him, or had any cause of personal quarrel. The

cause of personal quarrel they had was not so much with Rice as with the State of Pennsylvania. The commonwealth of Pennsylvania, following out a long, deliberate, statesmanlike policy, has declared that strikes for the betterment of the conditions of laborers are lawful, that men who are employed in a factory or in several factories may meet together and agree that they will not work unless they get certain improvements in terms, and that coming together is no longer as it was under the common law, a conspiracy. It is a harmless and lawful thing to do. Men have a right to strike, and have a right to refuse to work, but they have only a right to one kind of a strike. They cannot strike an individual with those pieces of murderous iron. That they cannot do lawfully." This statement of the right of a workman to refuse to join his fellow workmen in a strike, and to be protected in the exercise of that right was as correct in law, and as pertinent and timely as it was vigorous and plain. While the motive that actuated the assailants was for the jury to determine, yet in view of the undisputed facts, to which we have referred, and the entire absence of evidence of other motive, the trial judge did not exceed his province in expressing his opinion upon that subject, as he did in the instructions above quoted. But the remaining instructions contained in the thirteenth assignment, taken in connection with those quoted in the fourteenth, fifteenth, sixteenth, eighteenth, nineteenth and twenty-first assignments, go much farther than a mere expression of opinion, based on admitted or undisputed facts. Thus the learned judge said: "They had nothing against Rice, except that he refused to obey the order of the union that he should not work. It was not any original personal impulse, but it was the impulse of an organization which set itself up and declared a law superior to the commonwealth of Pennsylvania?" Again, "If men can be found to violate a law in the interest of an organization that holds itself in any of its parts (I do not

care whether it is a secret committee of one, two or three, to arrange for these cases) it is just as easy for that organization to arrange alibis and perjuries as to arrange assaults." Further on he said: "Somebody was arranging to attack Rice. Somebody was arranging to carry these things, and who would they be but the people in interest, and here are all these people in interest, the alibi people and all, including the host Berman. . . . You do not suppose that any four people who had no interest would risk the possession even and the use on the highway of those murderous weapons, if they had nothing against the man, and I have no doubt that those two people had nothing against the man except that he violated a law which they held to be superior to the law of Pennsylvania, that guarantees him the right to work if he wants to, and guarantees him the right to be immune against their physical violence." Again we quote: "The alibi is sworn to only by their own crowd, everything is made convenient." The thought that the assailants were carrying out the purpose of the larger organization was very plainly intimated during the trial. Karp, a witness for the defendants, was asked on cross-examination, as to his participation in other strikes. In overruling the objection the court said: "If they organized a force, and of course it is idle to contend that there was not an organized force here to assault this man, these people profess to know all about the force. Let them tell all they know." The same idea was intimated in an indirect but very damaging way by the questions which the court put to the same witness: "What was the committee on, murder or assault and battery?" and "Who was the committee on that kind of thing, those blackjacks and things?" The remarks and the instructions to which we have referred, whether taken separately or with the context, were well calculated to impress on the minds of the jurors, the idea or theory that the four assailants were members of a larger organization, which,

setting itself above the law, had decreed that the prosecutor and other workmen in that branch of industry, should not be permitted to work while the strike was pending, and that in making the assault they were acting in the interest of and under the impulsion of that organization. If it was proved that the larger organization referred to, whether the labor union or the body of strikers, had for its rules, principles, regulations or laws, the prevention of its members and others from working by intimidation and violence, it was made much easier for the jurors to believe the testimony of the commonwealth's witnesses that these defendants, who admittedly were members of the union and were strikers, were the assailants, and to discredit the alibi testimony of their fellow strikers and members of the union. See Hester v. Com., 85 Pa. 139. The pertinency of this line of reasoning to the alibi defense was clearly brought out in the charge; the argument could not have been presented more forcibly. But upon a very careful and painstaking examination of the testimony, we are constrained to the conclusion that it is based on a fact not proved. There was a strike, and it may be inferred that it was ordered by the labor union and that the defendants struck because of such order. But a strike of the members of a labor union does not necessarily imply an agreement among the strikers to prevent others from working by intimidation and violence, and the evidence wholly fails to show that there was such agreement or that this unlawful mode of making the strike effective was in accord with the general rules, principles or laws of the organization. As already intimated, there was ample evidence to sustain the inference that Rice was assaulted because he persisted in working,—because he was a "scab" as one of the assailants opprobiously called him—but that is a very different thing from saying that the assailants were acting in the interest of and under the impulsion of a larger

organization and were carrying out its purposes or policy. True, this would make no difference in the criminality of the acts proved, but it might make a vast difference in the jury's determination as to the credibility of the alibi witnesses. Strong and convincing as the testimony of the commonwealth's witnesses seemed to the trial judge, and seems to us, brutal and malicious as was the assault, and much as it is to be desired in the interest of law and order and for the vindication of the right of non-strikers to pursue their avocation without molestation, that the perpetrators should be punished, yet the defendants were entitled to a trial in which the credibility of their witnesses, and of themselves, should be decided by the jury, uninfluenced by other considerations than those that affirmatively appeared in the evidence, or legitimately flowed from the facts proved. We are of opinion that in the court's presentation to the jury of the theory to which we have referred, too much was taken for granted without proof, and that this resulted in prejudicial error.

The foregoing will sufficiently indicate our decision of the questions raised by the assignments of error and the grounds upon which we base our conclusion that the defendants are entitled to a retrial.

The judgment as to each of the appellants is reversed and venire facias de novo is awarded.